**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 15, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

HYDRO RESOURCES, INC.,

    Petitioner,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,

    Respondent,

and

NAVAJO NATION,

    Intervenor.

No. 07-9506

STATE OF NEW MEXICO;
NATIONAL MINING ASSOCIATION;
UNITED NUCLEAR CORPORATION;
STATE OF COLORADO; STATE OF
KANSAS; STATE OF UTAH; STATE
OF WYOMING; THE PUEBLO OF
SANTA CLARA; THE PUEBLO OF
SANDIA; THE PUEBLO OF ISLETA;
and THE PUEBLO OF ZIA,

    Amici Curiae.

**ON PETITION FOR REVIEW OF A FINAL ORDER OF THE**
**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**

Marc D. Flink (Alfred C. Chidester and Casie D. Collignon, Baker & Hostetler LLP, Denver, Colorado, and Jon J. Indall, Comeau, Maldegen, Templeman & Indall, LLP, Santa Fe, New Mexico, with him on the briefs) Baker & Hostetler LLP, Denver, Colorado, for Petitioner.

David A. Carson (Ronald J. Tenpas, Acting Assistant Attorney General, Ignacia S. Moreno, Assistant Attorney General, and John C. Cruden, Deputy Assistant Attorney General, with him on the briefs), United States Department of Justice, Environment and Natural Resources Division, Denver, Colorado, for Respondent.

Paul E. Frye (Louis Denetsosie, Attorney General, and David A. Taylor, Navajo Nation Department of Justice, Window Rock, Arizona, and Jill E. Grant, Nordhaus Law Firm, LLP, Washington, D.C., with him on the briefs), Frye Law Firm, P.C., Albuquerque, New Mexico, for Intervenor.

Gary K. King, Attorney General, and Christopher D. Coppin, Special Assistant Attorney General, Albuquerque, New Mexico, and Justin Miller, Chief Counsel, Office of the Governor, Santa Fe, New Mexico, filed an Amicus Curiae brief for the States of Colorado, Kansas, New Mexico, Utah, and Wyoming.

Anthony J. Thompson and Christopher S. Pugsley, Thompson & Simmons, PLLC, Washington, D.C., filed an Amicus Curiae brief for National Mining Association in support of Petitioner.

Robert W. Lawrence, Jonathan W. Rauchway and Constance L. Rogers, Davis Graham & Stubbs LLP, Denver, Colorado, filed an Amicus Curiae brief for United Nuclear Corporation in support of Petition for Rehearing en banc and in support of reversal.

Gary K. King, Attorney General, and Christopher D. Coppin, Special Assistant Attorney General, Albuquerque, New Mexico; Justin Miller, Chief Counsel, Office of the Governor, Santa Fe, New Mexico; Mark L. Shurtleff, Utah Attorney General, Salt Lake City, Utah; Steve Six, Attorney General of Kansas, Topeka, Kansas; John W. Suthers, Attorney General of Colorado, Denver, Colorado; and Bruce A. Salzburg, Attorney General of Wyoming, Cheyenne, Wyoming, filed an Amicus Curiae brief for the States of Colorado, Kansas, New Mexico, Utah, and Wyoming in support of Petitioner.

Richard W. Hughes, Rothstein, Donatelli, Hughes, Dahlstrom, Schoenburg & Bienvenu, LLP, Santa Fe, New Mexico, and David C. Mielke, Sonosky, Chambers, Sachse, Mielke & Brownell, Albuquerque, New Mexico, filed an

Amici Curiae brief for Pueblos of Santa Clara, Sandia, Isleta and Zia in support of Respondent.

---

Before **BRISCOE**, Chief Judge, **EBEL, TACHA, KELLY, HENRY, LUCERO, MURPHY, O'BRIEN, TYMKOVICH, GORSUCH,** and **HOLMES**, Circuit Judges.

---

**GORSUCH**, Circuit Judge, joined by **TACHA, KELLY, O'BRIEN, TYMKOVICH,** and **HOLMES**, Circuit Judges.

---

Everyone agrees that Hydro Resources, Inc. ("HRI") must obtain a Safe Drinking Water Act ("SDWA" or "the Act") permit to mine its property. The only question is: from whom? The Environmental Protection Agency ("EPA" or the "Agency"), which administers the Act, has chosen to delegate its permitting authority in the State of New Mexico to the New Mexico Environment Department ("NMED"), but with one exception: EPA has not delegated its authority to issue permits for mining activities on "Indian lands." Thinking its land hardly qualified as "Indian land" — HRI owns its property in fee, it pays county real estate taxes, the land is uninhabited, and it is not inside any Indian reservation or otherwise set aside and superintended for Indian use — the company proceeded to apply for, and obtain, a permit from NMED. Initially, EPA professed no quarrel with this, and it has never questioned NMED's administration of the Act. But eventually a dispute broke out over the status of HRI's land and, after years of regulatory wrangling, EPA issued a "final land

-3-

status determination" expressing its judgment that HRI's land qualifies as "Indian land." As a result, EPA ruled, HRI must seek and obtain its SDWA permit from it rather than NMED.

How did EPA reach this conclusion? By regulation, EPA chose to define the term "Indian lands" — the only lands for which it did not cede primary permitting authority to NMED — to be synonymous with "Indian country," as that term is defined by 18 U.S.C. § 1151. Section 1151, in turn, provides primary federal criminal jurisdiction over certain territories: "Indian reservation[s]," "dependent Indian communities," and "Indian allotments." So it is that, for EPA to exercise primary permitting authority in this case, the Agency had to argue that the federal government, rather than the State of New Mexico, possesses primary criminal jurisdiction over HRI's private property. In this case, EPA took the position that HRI's land is Indian country and subject to federal jurisdiction because it is part of a "dependent Indian communit[y]" under § 1151(b).

But whatever HRI's land is, it can't be that. In *Alaska v. Native Village of Venetie Tribal Government*, 522 U.S. 520 (1998), the Supreme Court identified two "requirements" of all "dependent Indian communities" under § 1151(b). First, "the land in question" must be an "Indian community" in the sense that it has been explicitly "set aside" by Congress (or the Executive, acting under delegated authority) "for the use of the Indians as Indian land." *Id.* at 527, 531. Second, "the land in question" must be "dependent" in the sense that it is "under

federal superintendence." *Id.* at 527. HRI's land — the land in question in EPA's final land status determination — is neither of these things.

Despite this, EPA argued before a panel of this court that we should cast our gaze beyond the particular land in question. In the Agency's view, because some sufficiently significant (though unspecified) percentage of neighboring lands — what EPA calls "the community of reference" — is Indian country, HRI's land must be considered Indian country, too. In defense of its view, EPA pointed to certain of this circuit's cases, most pre-*Venetie*, suggesting the approach it took. Deeming itself bound by the same authority, a panel of this court upheld EPA's classification of HRI's land as Indian country. *Hydro Res., Inc. v. U.S. EPA*, 562 F.3d 1249 (10th Cir. 2009) ("*HRI II*").

HRI responded to all this with a petition for *en banc* review. The company argued that the "community of reference" approach advanced by EPA and certain of this circuit's cases is inconsistent with *Venetie*. HRI submitted, too, that our cases are in conflict with each other — while some follow EPA's approach, others after *Venetie* have abjured the "community of reference" test, as have decisions in our sister circuits. Seeking to sort all this out, we granted HRI's request for *en banc* review.

Having now heard the case anew, we find ourselves compelled to vacate EPA's final land status determination. EPA's interpretation cannot be reconciled with the Supreme Court's explanation of § 1151(b)'s plain meaning. *Venetie*

explicitly rejected a Ninth Circuit test composed of the very factors used in the "community of reference" test employed by EPA and certain of our pre-*Venetie* cases. Neither is the amorphous "community of reference" test compatible with the history and structure of the statute we are charged to interpret, or with the Supreme Court's longstanding direction that criminal statutes should be interpreted clearly and precisely to afford fair warning of their reach.

None of this is to say that EPA must tether its SDWA permitting authority to a statute defining the scope of the federal government's criminal jurisdiction over Indian lands. Had EPA chosen to define its authority under the SDWA in a different way, the result in this case might have been different. But we decide the cases as they come to us. And in this case, heeding the Supreme Court's commands in *Venetie* requires us to grant HRI's petition for review and vacate the Agency's final land status determination.

I

The history of this dispute is long and tangled. Even so, some appreciation of its twists and turns is essential. We begin by examining briefly the history of the land in question (Section I.A), the regulatory scheme governing that land and the parties before us (Section I.B), the parties' first lawsuit before this court (Section I.C), its subsequent remand to EPA (Section I.D), and the current appeal (Section I.E), all before we turn to address our jurisdiction and standard of review (Section II) and, at last, the merits of this appeal (Section III).

A

The land at issue in this case lies in what is commonly known as the "checkerboard" region of northwestern New Mexico. *See generally Pittsburg & Midway Coal Min. Co. v. Yazzie*, 909 F.2d 1387, 1389-92 (10th Cir. 1990). This region abuts the southern and eastern boundaries of the Navajo Reservation originally created by an 1868 treaty between the United States and the Navajos. *Id.* at 1389. And a checkerboard it is, marked by alternating parcels of land owned by the state, the federal government, the Navajo Nation, individual Navajos, and private persons and entities. *See id.* at 1423 app. A (map section marked "J"); Appendix.[1]

The checkerboard seems to have had its start with the railroad. In the late nineteenth century, the federal government granted certain lands in the region to railroad companies in an effort to induce construction. "These grants typically consisted of alternating one-mile-square parcels on each side of the planned line for the railroad tracks . . . ." *HRI II*, 562 F.3d at 1254 n.3. From this, a checkerboard was born, aided and abetted by the fact that other tracts of land in this area, though still formally held in the public domain, were occupied by

---

[1] The Appendix reproduces a map of the Church Rock Chapter and its boundaries. The map was prepared as part of the Church Rock Chapter's Land Use Plan and included in the record before the Agency. *See* R. 16b; R. 40 at B-39.

Navajos, while still others were being rapidly snapped up by white and Mexican settlers. *Yazzie*, 909 F.2d at 1390.

And this was just the start of the complications. As Judge Anderson explained in his thorough history of the area, by the turn of the twentieth century federal officials became concerned that the new settlers were "appropriating the limited water holes for themselves." *Id.* at 1390. So, in an effort to protect the Navajo population, President Theodore Roosevelt signed two executive orders, E.O. 709 and E.O. 744, in 1907 and 1908, respectively. The combined effect of these orders was to add much of the land in this area to the Navajo Reservation. *Id.* at 1391. At the same time, the President's orders expressly preserved preexisting private property rights, including the railroad land grants. Thus, "the extension to the Reservation" further complicated the variegated character of the area. *Id.* at 1391 n.6.

Still more checkerboarding followed. It seems the government did not intend the area to become a permanent addition to the Reservation. *See id.* Instead, the plan apparently was to allow Indians[2] then living in the area a brief period to claim and "receive 160-acre allotments in severalty without interference

---

[2] We recognize that "most tribal members do not refer to themselves as generic 'Indians' or 'Native Americans,' but rather as constituents of particular groups, such as Hopi or Cheyenne" or Navajo. Cohen's Handbook of Federal Indian Law, § 3.01 at 134 n.1 (Nell Jessup Newton et al. eds., 3d ed. 2005). We use the general term "Indian" throughout this opinion in light of its use in the relevant statutory language and precedents.

from whites and Mexican stockmen." *Id.* at 1390. After that, any unallotted land was to revert from reservation status back to the public domain. *See id.* And this is exactly what transpired in 1911 by virtue of another executive order, this one issued by President Taft. *Id.* at 1392. Since then, land in this area has changed hands many times in still more complicating ways. In 1928, for example, Congress appropriated funds for the purchase of some privately held former railroad tracts in order that they might be held by the federal government for the benefit of the Najavo. *HRI II*, 562 F.3d at 1254 n.3. Meanwhile, other parcels now belong to the New Mexico state government or remain in the hands of non-Indians.

HRI's land falls into this final category. In 1970, the federal government sold 160 acres in the southeast quadrant of "Section 8," Township 16N, Range 16W, to the United Nuclear Corporation. *See* Appendix. In turn, United Nuclear later sold the land to HRI. There are no inhabitants on HRI's land. Except for the brief period from 1907-11, it has not been set aside by Congress for Indians or placed under federal superintendence for their benefit. The remaining three quadrants of Section 8 land not owned by HRI are still owned in fee by the United States. R. 15c App. XI at para. 3. Other adjacent sections include parcels held in trust for the Navajo by the United States (Sections 9 and 17) and land owned by the State of New Mexico (Section 16). *See* Appendix.

Section 8 lies within McKinley County, New Mexico. The county seat resides in the city of Gallup, "approximately 11 miles southwest of the Section 8 land." *HRI II*, 562 F.3d at 1254. The state and county exercise jurisdiction over private lands throughout the checkerboard area. So, for example, the State of New Mexico maintains the only road access to Section 8, State Highway 566, while McKinley County shares responsibility with the federal government for other roads in the vicinity. *HRI II*, 562 F.3d at 1254. The County provides essential public services to private lands like HRI's, including fire, police, and emergency services. *Id.* The Gallup/McKinley County public school system offers public education and school transportation for those in the area. *Id.* And HRI pays annual property taxes on its land to McKinley County. *Id.*

Section 8 also falls within the boundaries of the Navajo Church Rock Chapter. The Chapter is a political and social unit of the Navajo Nation, with its boundaries and membership determined by the Tribe. *See id.* at 1255.[3] The

---

[3] The EPA's final land status determination states that the "Church Rock Chapter was first established in 1927 by the United States as a subdivision of the Navajo Nation government, to facilitate local Navajo self-government and to foster improved communications between Navajos and federal agencies." R. 44 at 8. HRI disputes this conclusion. First, HRI argues that the 1927 date makes no sense, because it was a year before the government began repurchasing for Indian use much of the land that now comprises the Chapter. Second, HRI argues that the record contains no support for the assertion that the federal government established the Church Rock Chapter. Upon review of the source cited by EPA, it appears HRI may have the better of the argument. While the source suggests that the federal government played some undefined role in helping to establish Navajo

(continued...)

-10-

current boundaries as drawn by the Tribe include tracts owned in fee by the United States, privately held lands, and Navajo Nation lands. *Id.* At the same time, the Chapter's boundaries exclude at least one parcel of state land, Red Rock State Park, thus creating a sort of "doughnut hole" in the middle of the Chapter. *See* Appendix. While most of the land in the Chapter lies north of Interstate 40, the Chapter does include a narrow traverse across the Interstate and a small tract on the highway's south side. *See id.*

The political and social center of the Church Rock Chapter is the Chapter House, located in the village of Church Rock, six miles east of Gallup and about six miles south of Section 8. *See id.* Much of the membership of the Chapter lives in close proximity to the Chapter House, and Chapter members typically visit the Chapter House at least once a month for meetings and social activities and services. R. 40 at B-29. At the same time, nearly half of the Chapter's members are employed in Gallup and so travel there frequently, compared to just 2% who are employed within the Chapter's boundaries. R. 40 at B-24. The Chapter recognizes that private lands within its boundaries are subject to state jurisdiction and control, R. 40 at C-16, and the Chapter provides no infrastructure

---

[3](...continued)
chapters beginning in 1927, it does not mention the Church Rock Chapter, let alone indicate that the federal government established it. *See* Robert Young, Navajo Yearbook 191 (1958). The record, at least as briefly adduced by the parties in this litigation, thus suggests that the Navajo Nation, not the federal government, established the Chapter.

or services to HRI's portion of Section 8, R. 6 at 2. Indeed, a significant portion of the territory within the Chapter, including Section 8, consists of "rugged mountain ranges, canyons, and highlands" that, according to the Chapter, are "not suitable for community or industrial development." R. 40 at B-40.

B

After purchasing its Section 8 land, HRI sought to mine it for uranium. In preparation, the company obtained various regulatory permits. Because HRI's proposed mining operations contemplated the use of an underground injection system to extract the ore, SDWA regulations required the company to obtain approval of an underground injection control ("UIC") plan aimed at mitigating the risk of contamination to potential drinking water sources.[4]

While EPA is responsible for administering the SDWA, Congress anticipated that the states would, at least sometimes, serve as the primary entities responsible for reviewing and granting or denying UIC permits. In the SDWA, Congress told EPA it could "either approve, disapprove, or approve in part and

---

[4] "Underground injection . . . means the subsurface emplacement of fluids by well injection . . . ." 42 U.S.C. § 300h(d)(1)(A). Basically, HRI seeks to pump water into the ground and circulate that water in order to pull uranium to the surface where it can be easily collected. This method is apparently less onerous than manually excavating the rock from underground and removing the uranium later. R. 15c App. II at 1, 3-4 ("Instead of manually excavating the rock from underground as in conventional mining and placing it in large piles on the surface, water wells are used, very much like those for a home. Oxygen is added to the native ground water from the ore body, and that water is continuously circulated until most of the uranium is recovered.").

disapprove in part, [each] State's" application to become the primary UIC permitting authority. 42 U.S.C. § 300h-1(b)(2). The Act then went on to direct EPA to promulgate certain standards that the state UIC regulatory programs would have to meet to achieve this distinction. *See* 42 U.S.C. § 300h; 40 C.F.R. § 144.1(e). Exercising these statutory authorities granted to it, EPA some time ago set standards for state UIC programs and approved NMED's application to serve as the primary UIC permitting authority in the State of New Mexico, except with respect to underground injection wells "on Indian lands." 40 C.F.R. §§ 147.1600-147.1601.

It is here the real regulatory complications begin. How do we know when underground injection wells lie on "Indian lands"? By regulation, EPA has chosen to define the phrase "Indian lands," when it appears in SDWA regulations, to mean "Indian country," as that term is defined by 18 U.S.C. § 1151. *See* 40 C.F.R. § 144.3. Adopted in 1948, § 1151 is part of the criminal code and circumscribes where the federal government or a tribe, rather than a state, may exercise primary criminal jurisdiction. At the same time, the statute has been used often, as EPA has chosen to use it here, to define the scope of federal authority over civil and regulatory matters. *See Venetie*, 522 U.S. at 527; Cohen's

Handbook of Federal Indian Law § 3.04[1] (Nell Jessup Newton et al. eds., 3d ed.

2005) (hereinafter "Cohen (2005)").[5]

Section 1151 defines "Indian country" as encompassing three categories of

land:

> (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation,

> (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and

> (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

18 U.S.C. § 1151.

Having thus defined the scope of "Indian lands" under its SDWA

regulations, EPA still faced the question: Who, if not the state, should enjoy

primary authority to regulate wells on those lands? The SDWA entrusts primary

UIC permitting authority to EPA but allows the Agency to delegate that authority

---

[5] While statutory criminal jurisdiction has been confined to "Indian country" as defined in § 1151, it has been said that Congress enjoys "plenary power over Indian affairs," *Venetie*, 522 U.S. at 531 n.6, by virtue of Article I, Section 8, Clause 3 of the Constitution, which ascribes to Congress exclusive authority over "Commerce . . . with the Indian Tribes." Whether and how far Congress's constitutional authority to authorize federal "Indian country" jurisdiction might proceed beyond the limits of § 1151 is not before us in this case.

to tribes, much as it does to states, at least with respect to permit applications "within the area of the Tribal Government's jurisdiction." 42 U.S.C. § 300j-11(b)(1)(B); *see also* 42 U.S.C. § 300h-1(e). And by regulation, EPA has indicated that a "Tribal Government's jurisdiction" for these purposes may not extend beyond "Indian country," as that term is (once again) defined in § 1151. *See, e.g.*, Navajo Nation; Underground Injection Control (UIC) Program; Primacy Approval, 73 Fed. Reg. 65,556-01, at 65,558-65,560 (Nov. 4, 2008) ("EPA recognizes that 18 U.S.C. 1151 . . . generally defines the limit of the area over which a Tribe may demonstrate authority.").

In 1994, EPA chose to exercise this authority to delegate primary UIC permitting authority to the Navajo Nation for lands within the Navajo Reservation, as well as for certain other Navajo allotments and Navajo fee lands. *HRI, Inc. v. EPA*, 198 F.3d 1224, 1232 (10th Cir. 2000) ("*HRI I*"). At the same time, however, EPA declined to approve the Tribe's application to assume primary UIC permitting authority over all privately held fee lands in the checkerboard region where Section 8 resides. *Id.* at 1233. It was and is undisputed that these lands do not qualify as part of any Indian reservation within the meaning of § 1151(a), or as Indian allotments within the meaning of § 1151(c). Though the Tribe sought to persuade EPA that the lands nonetheless qualify as "Indian country" because, given social and political affinities in the area, they are part of a larger "dependent Indian community" within the meaning

-15-

of § 1151(b), EPA rejected this claim. The Agency explained its view that the Tribe had "not demonstrated that it has jurisdiction" over the lands in question, R. 13b at 239 (emphasis in original), adding that, "[b]efore it could determine if a parcel of land is part of a dependent Indian community (and therefore is Indian country), EPA would need more information about that particular parcel of land." *Id.* at 238. The Agency thus left open at least the hypothetical possibility that there could be "Indian lands" within the checkerboard area over which it, rather than the Navajo Nation, might retain primary UIC regulatory authority — at least until such time as the Tribe could come forward with evidence showing that the "particular parcel of land" in question qualified as Indian country under § 1151(b).

C

It is perhaps unsurprising that such a complex land ownership scheme, overlaid by such a complex regulatory scheme, might beget equally complex litigation. And so it did when HRI tried to ascertain which regulatory authority held the UIC permit it needed. HRI knew that the Tribe didn't have permitting authority over its land, at least not yet. The remaining choices HRI thus confronted were EPA or NMED. Not conceiving of its land as part of a "dependent Indian community" within the meaning of § 1151(b), and absent any EPA decision holding otherwise, HRI requested a UIC permit from NMED. For

their part, New Mexico state authorities agreed that HRI's land wasn't Indian land, reviewed HRI's UIC application, and in 1989, approved it.

As part of the permitting process, NMED sought from EPA a mandatory "aquifer exemption" for HRI's mining activities, because those activities contemplated the introduction of contaminants into an aquifer. Generally speaking, the SDWA prohibits contamination of underground aquifers. *See* 42 U.S.C. § 300h(b). But because certain aquifers "will never be used as sources of drinking water, . . . EPA [has] adopted criteria for exempting [them] from SDWA requirements." *HRI I*, 198 F.3d at 1233. In due course, EPA approved NMED's requested exemption because, in EPA's judgment, the aquifer under HRI's land "does not currently serve as a source of drinking water" and "cannot now and will not in the future serve as a source of drinking water." 40 C.F.R. § 146.4 (a) & (b); *see also HRI I*, 198 F.3d at 1234; R. 15c App. II at 2 (noting that, even before any mining activity, "water quality at the Section 8 site is mineralized with naturally-occurring uranium, and uranium decay products . . . exceeding U.S. EPA drinking water [standards].").

About this time, however, a jurisdictional dispute arose regarding HRI's planned mining operations on Section 8 and on nearby Section 17. The dispute proved protracted as state, federal, and tribal authorities wrangled over whether HRI's UIC operations should be regulated by NMED or EPA. *See HRI I*, 198 F.3d at 1234-35. At some point during this back-and-forth, the Navajo Nation

-17-

presented what EPA considered to be "substantial arguments to support its claim

that Section 8 is within Indian country." *Id.* at 1235 (quoting EPA opinion letter

of July 14, 1997). Based on these assertions, EPA deemed Section 8's Indian-

land status to be "in dispute." *Id.*

Eventually, in the late 1990s, HRI and NMED sought review of EPA's

assessment in this court. HRI argued that its Section 8 land wasn't a "dependent

Indian community" within the meaning of § 1151(b), and so primary UIC

permitting authority rested with NMED, not EPA or the Tribe.[6] For its part, EPA

asked the court to remand the matter because it still hadn't reached a final

decision on the question of Section 8's status as Indian country. *See HRI I*, 198

F.3d at 1236 n.6 (quoting EPA Brief). EPA explained its delay by pointing to the

Supreme Court's then-recent decision in *Venetie*, which indicated that to qualify

as Indian country under § 1151(b) "the land in question" must be set aside for

Indians and federally superintended. *Venetie*, 522 U.S. at 531. In arriving at this

holding, EPA noted, the Supreme Court expressly rejected a "more textured"

---

[6] HRI also sought review of EPA's assertion of jurisdiction over its mining
activities on Section 17. *See HRI I*, 198 F.3d at 1243-44. Unlike its Section 8
land, HRI owns only the mineral rights for Section 17, while the federal
government holds the Section 17 land in trust for the Navajos. The panel in *HRI I*
held that Section 17 was Indian country under § 1151(a) and thus HRI's mining of
that land was subject to EPA's regulatory jurisdiction. *Id.* at 1249-54. HRI did
not seek review of that issue with the *en banc* court or file a petition for certiorari
with the Supreme Court. Consequently, all that remains in dispute is HRI's
Section 8 land.

balancing test adopted by the Ninth Circuit, a test the Ninth Circuit consciously modeled on preexisting Tenth Circuit jurisprudence. *See State of Alaska ex rel. Yukon Flats Sch. Dist. v. Native Vill. of Venetie Tribal Gov't*, 101 F.3d 1286, 1291-93 (9th Cir. 1996) (quoting *Pittsburg & Midway Coal Mining Co. v. Watchman*, 52 F.3d 1531, 1545 (10th Cir. 1995)). EPA defended its remand request by stressing that it hadn't yet had an adequate chance to "develop a record below with the *Venetie* standard in mind." *HRI I*, 198 F.3d at 1236 n.6 (quoting EPA Brief at 47).

Shortly before *Venetie*, this court in 1995 developed a two-step, multi-variable balancing test for identifying "dependent Indian communities" under § 1151(b), sometimes called the "*Watchman* test." At its "first step," the test required the identification of an "appropriate community of reference." *Watchman*, 52 F.3d at 1543-44. When identifying an appropriate "community of reference," we said, a court had to consider three factors: (1) "the geographical definition of the area proposed as a community," *United States v. Adair*, 111 F.3d 770, 774 (10th Cir. 1997); (2) "the status of the area in question as a community," *Watchman*, 52 F.3d at 1543; and (3) "the community of reference within the context of the surrounding area," *id.* at 1544. Within the second factor, the *Watchman* test called on us to inquire whether there is "an element of cohesiveness . . . that can be manifested either by economic pursuits in the area, common interests, or needs of the inhabitants as supplied by that locality," and

-19-

consider whether the proposed community qualifies as "a mini-society consisting of personal residences and an infrastructure potentially including religious and cultural institutions, schools, emergency services, public utilities, groceries, shops, restaurants, and the other needs, necessities, and wants of modern life." *Id.* at 1544. And within the third factor, we considered which public entity or entities "provide infrastructure, government, essential services, and employment" for the community. *Adair*, 111 F.3d at 775.

All of this, however, was just the beginning. Having identified a "community of reference," our test then sought, at the "second step," to determine whether that community qualified as a dependent Indian community. And this, we said, required the balancing of still more factors: "(1) whether the United States has retained title to the lands which it permits the Indians to occupy and authority to enact regulations and protective laws respecting this territory; (2) the nature of the area in question, the relationship of the inhabitants in the area to Indian tribes and to the federal government, and the established practice of government agencies toward the area; (3) whether there is an element of cohesiveness manifested either by economic pursuits in the area, common interests, or needs of the inhabitants as supplied by that locality; and (4) whether such lands have been set apart for the use, occupancy and protection of dependent Indian peoples." *Watchman*, 52 F.3d at 1545 (internal quotation marks and alterations omitted). Only the first and fourth of these elements, however, added

entirely new concepts to the mix; the second and third elements overlapped in significant measure with elements of the antecedent "community of reference" analysis. Even so, *Watchman* instructed the use of these elements at both steps in the analysis and held that, if both steps were satisfied, all land inside the "community of reference" qualified as "Indian country." *See id.*

In *HRI I*, a panel of this court acknowledged that *Venetie* altered this legal landscape and that EPA had not yet had a chance to issue a final determination about the status of HRI's land in light of it. Accordingly, the panel held that EPA's analysis of HRI's Section 8 land wasn't yet ripe for review and remanded the matter to the Agency for a final determination of the legal status of HRI's land. *HRI I*, 198 F.3d at 1237, 1254. After reaching this holding, however, the panel proceeded "[i]n dicta," *State v. Frank*, 52 P.3d 404, 408 (N.M. 2002), to consider *Venetie*'s possible impact on this circuit's *Watchman* test. On the one hand, the panel acknowledged that "*Venetie* may require some modification" to our test. 198 F.3d at 1248; *see also id.* at 1254. But, on the other hand, the panel also suggested that "nothing in *Venetie* speaks to the propriety of the first element of that test — determination of the proper community of reference." *Id.* at 1248.

D

With that for guidance, EPA on remand proceeded to invite comments from interested parties. Ultimately, the Agency received comments from the State of New Mexico, McKinley County, various corporations, and more than one hundred

-21-

Navajo allottees arguing that HRI's Section 8 land should not be considered part of a dependent Indian community. At the same time, the Agency received comments from the Navajo Nation, the Navajo Church Rock Chapter, and many others arguing that the land should be considered Indian country. In addition to all this, EPA consulted the Interior Department's Solicitor's Office and the Navajo Nation.

At the end of its review, the Agency acknowledged that "[s]everal commenters have suggested that the community-of-reference analysis is no longer intact." *EPA Land Status Determination*, R. 44 at 4. Yet, seeming to take its cue from *HRI I*'s intimation that *Venetie* had not spoken "directly" to *Watchman*'s threshold community of reference test, EPA concluded that the test survived *Venetie* — at least in the Tenth Circuit, if not elsewhere. *Id.* At the same time, the Agency decided that *Venetie* modified *Watchman*'s second step, replacing its four-part test with a two-part test focused on how much of the "community of reference" is set aside for Indians and federally superintended. If some sufficiently high, though unspecified, percentage of the "community of reference" met these requirements, EPA would treat all land within the community of reference as Indian country under § 1151(b). *Id.* at 11-12.

Turning to apply its understanding of § 1151(b) to the facts of this case, EPA concluded that the Navajo Church Rock Chapter was "the appropriate community of reference" at *Watchman*'s first step because the Chapter functions

-22-

as a "mini-society." *Id.* at 8-9. EPA did not, however, pause to consider whether the appropriate community of reference might be McKinley County, and it considered Gallup as a candidate only briefly in a footnote. *Id.* at 10 n.64. Neither did EPA consider whether Section 8 might be part of no community at all; rather, its analysis seemed to presuppose that every piece of land is part of *some* community of reference.

After having identified what it considered to be the appropriate community of reference, EPA then applied *Venetie*'s set-aside and federal superintendence requirements to that community. While HRI's Section 8 land itself was indisputably neither set aside for Indian use nor federally superintended, EPA reasoned that *all* of Church Rock Chapter is Indian country because a sufficiently high percentage of the land within its boundaries are set aside for Indian use and federally superintended. So it is that, by this series of steps, EPA determined that Section 8 "is within the dependent Indian community of the Church Rock Chapter and, thus, is Indian country." *Id.* at 13. And so it is that EPA required HRI to file a new UIC permit application with the federal government.

E

Again HRI petitioned this court for review. The company argued, much as it had in *HRI I*, that *Venetie* abrogated the *Watchman* test on which EPA relied in justifying and conducting its threshold "community of reference" inquiry. In

-23-

HRI's view, *Venetie* said that § 1151(b) requires a court to ask *only* whether "the land in question" is set aside for Indian use and federally superintended, no more.

The panel, considering itself constrained by *HRI I*'s suggestion that *Watchman*'s community of reference test survived *Venetie*, rejected HRI's argument and upheld the agency's final land status determination. *HRI II*, 562 F.3d at 1261. Judge Frizzell, sitting by designation, dissented in part. He questioned whether Section 8 is fairly included within the Church Rock community of reference, given that it is uninhabited and isolated land that the Chapter has deemed "incapable of sustaining a community." *HRI II*, 562 F.3d at 1269 (Frizzell, J., concurring in part and dissenting in part). Judge Frizzell also questioned the community of reference test, noting that "[a]s long as a Chapter *as a whole* satisfies whatever percentage of federal set-aside and supervision a federal court deems necessary, tribal law may itself define the boundaries of Indian country outside" reservations. *Id.* at 1270-71. Through this application "of our community of reference test," Judge Frizzell emphasized, "we take an unprecedented step. Never before has non-Indian fee land outside the exterior boundaries of a reservation or Pueblo been held to be a dependent Indian community." *Id.* at 1270.

After the panel issued its decision, HRI petitioned for rehearing *en banc*, asking us to tackle the one issue the panel thought it could not — whether *Watchman*'s community of reference test remains an appropriate part of § 1151(b)

analysis after *Venetie*. In support of its petition, the company suggested *HRI I* had opened a split of authority within this circuit: while *HRI I* suggested that the community of reference survived *Venetie*, in *United States v. Roberts*, 185 F.3d 1125 (10th Cir. 1999), a previous panel of this court had analyzed a § 1151(b) claim without reference to *Watchman*'s community of reference analysis, asking only *Venetie*'s two questions. *See also Frank*, 52 P.3d at 408 (noting the same tension in this circuit's post-*Venetie* case law). Though reluctant to protract even further this already aged dispute, in light of the arguably inconsistent guidance offered by different panels of this court we granted HRI's petition for *en banc* review.[7]

II

Before we can address the merits of this dispute, we must first attend to antecedent questions about our subject matter jurisdiction (Section II.A) and standard of review (Section II.B).

---

[7] Pending before the court are several motions seeking leave to file amicus briefs. Because the movants possess an adequate interest and present arguments that are useful to this court, we grant the motions of the Pueblos of Santa Clara, Sandia, Isleta, and Zia and the United Nuclear Corporation. We deny the motion of the American Indian Law Professors for leave to file an amicus brief only because granting the motion would cause one or more members of this court to recuse themselves from the matter. See 16AA Charles Alan Wright et al., *Federal Practice and Procedure* § 3975, at 318-19 (4th ed. 2008) ("Some circuits will restrict amicus filings in order to avoid disqualifying a member . . . of the en banc court . . . ."). The states of Colorado, Kansas, New Mexico, Utah, and Wyoming also filed an amicus brief, which Federal Rule of Appellate Procedure 29(a) allows them to do without requesting the leave of this court.

A

Federal courts do not wield plenary jurisdiction over every slight or suit. Instead, our authority is restricted in ways small and large by constitutional and statutory design. Because of this, the task of ensuring ourselves of our own subject matter jurisdiction "is not a mere nicety of legal metaphysics," but essential to the rule of law in "a free society . . . . The courts, no less than the political branches of government, must respect the limits of their authority." *U.S. Catholic Conference v. Abortion Rights Mobilization, Inc.*, 487 U.S. 72, 77 (1988); *see also In re C & M Properties, L.L.C.*, 563 F.3d 1156, 1161 (10th Cir. 2009).

Before the panel, EPA challenged HRI's standing under Article III of the Constitution, arguing that its final land status determination imposed no constitutionally cognizable injury on HRI. After all, EPA said, that determination "merely implicates *which regulator* (NMED or EPA) will enforce UIC regulations," and does nothing to alter the substantive SDWA threshold HRI or anyone else must clear in order to obtain a UIC permit. *HRI II*, 562 F.3d at 1258 (emphasis in original). In support of its argument, EPA emphasized New Mexico's representation that its state UIC permitting process "is more stringent in some respects than the Federal program," and the absence of any evidence that EPA's process or permit would involve "more onerous terms than NMED['s]."

-26-

EPA's Merits Brief at 19-20, *HRI II*, 562 F.3d 1249 (10th Cir. 2009) (No. 07-9506).

Under Article III, federal courts have jurisdiction only to decide "Cases" and "Controversies." U.S. Const. art. III, § 2. One "essential and unchanging part of the case-or-controversy requirement" is the concept that the plaintiff must have "standing," which in turn requires the presence of "three elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). A party has standing to pursue a claim in federal court only if: (1) it "suffered an 'injury in fact' — an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) that injury is "fairly traceable to the challenged action of the defendant" rather than some third party not before the court; and (3) that injury is likely to be "redressed by a favorable decision." *Id.* at 560-61 (internal quotation marks, alterations, and citations omitted).

Before us, EPA has disputed only the first element — injury in fact.[8] The Agency's challenge, however, cannot succeed. Even if, as EPA would apparently have us assume, its UIC permitting process is no stricter than New Mexico's, the panel opinion in this case correctly explained that "the outlay of funds necessary

[8] EPA hasn't challenged the remaining elements of constitutional standing for good reason. HRI's claimed injury — having to incur the expenses associated with a second UIC application — is directly traceable to EPA's final land status determination. And that injury is fully redressable by a favorable decision of this court vacating EPA's decision as incompatible with the law.

to secure" a second UIC permit from EPA, on top of the one HRI has already secured from NMED, amply qualifies as a concrete and particularized, actual and imminent injury. *HRI II*, 562 F.3d at 1259. As we have previously explained, "the out-of-pocket cost to a business of obeying a new rule of government[,] . . . whether or not [there may be] pecuniary loss" associated with the new rule, suffices to establish an "injury in fact." *Nat'l Collegiate Athletic Ass'n v. Califano*, 622 F.2d 1382, 1386 (10th Cir. 1980). EPA's final land status determination requires HRI to undergo the UIC permit process for a second time — this time with the federal authorities — before it can mine its property. There is nothing hypothetical or conjectural about that, or about the fact that such a "re-do" would impose on HRI *some* additional administrative costs. Maybe those costs wouldn't break HRI's bank, but that's hardly required to constitute a constitutionally cognizable injury. *See id.* at 1389 ("Certainly the cost of obeying the regulations constitutes injury.").[9]

B

---

[9] HRI notes this court's previous suggestion that "[c]ompulsion by unwanted and unlawful government edict is injury *per se*." *Califano*, 622 F.2d 1389; *see also* 13A Charles Alan Wright et al., *Federal Practice and Procedure* § 3531.4, at 249 (3d ed. 2008) ("[I]njury sufficient to support standing may be found in subjection to unwanted procedures."). The panel did not reach or rest its standing holding on this ground, however, and neither must we, given that EPA's rulings will indisputably impose some out-of-pocket costs on HRI.

-28-

Assured of HRI's constitutional standing to bring this appeal, before reaching the merits it remains to ask whether and to what degree we are statutorily empowered to review EPA's decision.

The SDWA authorizes us to review "final actions" taken by EPA in its administration of the statute. 42 U.S.C. § 300j-7(a)(2). The parties before us agree that EPA's final land status determination qualifies as such a final action, and we can see no basis on which we might disagree. But though the SDWA grants us the power to review EPA's action in this case, it does not tell us what standard of review we should use in doing so. When the legislation at hand doesn't supply a standard of review for us to apply, the Administrative Procedure Act ("APA") provides the default, filling the gap and telling us, among other things, that we "shall . . . hold unlawful and set aside agency action, findings, and conclusions, found to be arbitrary and capricious, an abuse of direction, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

It is this last phrase — "otherwise not in accordance with law" — most directly at issue here. *See FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003) ("The Administrative Procedure Act requires federal courts to set aside agency action that is 'not in accordance with law' — which means, of course, *any* law, and not merely those laws that the agency itself is charged with administering." (citation omitted)). EPA's final land status determination represents the Agency's interpretation of its earlier regulations affording NMED

primary authority to regulate UIC wells in New Mexico "except on Indian lands," 40 C.F.R. §§ 147.1600-147.1601, and then defining "Indian lands" to mean "Indian country" as that term is used in 18 U.S.C. § 1151, *id.* § 144.3.  It is by dint of these regulatory choices that, in the end, EPA faced the purely legal task of interpreting § 1151 in its final land status determination.  And it is by dint of this that we must ask whether EPA's interpretation of § 1151 is or is not in accordance with the statute.

Of course, courts afford considerable deference to agencies interpreting ambiguities in statutes that Congress has delegated to their care, *see Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984), including statutory ambiguities affecting the agency's jurisdiction, *see Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 844 (1986); *see also Miss. Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354, 381 (1988) (Scalia, J., concurring in the judgment); *Teamsters Local Union No. 523 v. NLRB*, 590 F.3d 849, 850-51 (10th Cir. 2009).  Courts do not, however, afford the same deference to an agency's interpretation of a statute lying outside the compass of its particular expertise and special charge to administer.  *See Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 137 n.9 (1997) (no deference given to agency interpretation of statute, in part, because the agency was not "charged with administering" it); *Adams Fruit Co. v. Barrett*, 494 U.S. 638, 649 (1990) ("A precondition to deference under *Chevron* is a congressional delegation of administrative

-30-

authority."); *see also Crandon v. United States*, 494 U.S. 152, 174 (1990) (Scalia, J., concurring in the judgment) ("The law in question, a criminal statute, is not administered by any agency but by the courts.").

Section 1151 quite clearly does not fall within EPA's particular expertise or charge to administer.  It is not a statute specially involving environmental regulation, but one all and only about the geographic parameters of federal and tribal criminal prosecutorial authority.  Even so, we need not decide whether EPA's interpretation of the statute is entitled to deference because, throughout the proceedings before the panel and now the *en banc* court, EPA itself hasn't claimed any entitlement to deference.  In these circumstances, when the agency doesn't ask for deference to its statutory interpretation, "we need not resolve the . . . issues regarding deference which would be lurking in other circumstances," *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 477 (1992), and so may proceed to review EPA's interpretation of § 1151(b), as the Agency would have us and the panel did, *de novo*.[10]

---

[10]  Though claiming no entitlement to deference for its legal interpretation of § 1151(b), EPA does seek deference for its factual findings in applying its interpretation of the statute to this case.  *See* 5 U.S.C. § 706(2)(E) (establishing "substantial evidence" review); *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 366 (1998).  As will be apparent in the analysis that follows, however, only purely legal questions, not factual ones, are in dispute before us.

The principal dissent agrees that EPA is not entitled to *Chevron* deference, but argues that the Agency deserves *Skidmore* deference.  Principal Dissent at 5
(continued...)

-31-

III

With this much resolved, we finally reach the merits. The dispute here is a purely legal one: Does the *Watchman* community of reference test remain viable

---

[10](...continued)
n.2. Of course, an agency's interpretation of a statute merits deference under *Skidmore* only in "proportion[] to its 'power to persuade.'" *United States v. Mead Corp.*, 533 U.S. 218, 235 (2001) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)); *see also id.* at 250 (Scalia, J., dissenting) (*Skidmore* deference is a "statement of the obvious: A judge should take into account the well-considered views of expert observers."). Whether or not *Skidmore* compels us to do so, we certainly seek in this opinion to take into account EPA's considered views. But we decline to decide the question whether we are *obliged* by *Skidmore* to afford even this modicum of deference, for a few reasons. First, EPA has not sought *Skidmore* deference, and when a party chooses not to pursue a legal theory potentially available to it, we generally take the view that it is "inappropriate" to pursue that theory in our opinions. *United States v. Int'l Bus. Mach. Corp.*, 517 U.S. 843, 855 (1996); *see also Estate of Cowart*, 505 U.S. at 476-77 (declining to pass on deference question because the agency requested no deference); *cf. Spector Motor Serv., Inc. v. Walsh*, 139 F.2d 809, 823 (2d Cir. 1943) (L. Hand, J., dissenting) ("[It is not] desirable for a lower court to embrace the exhilarating opportunity of anticipating a doctrine which may be in the womb of time, but whose birth is distant . . . ."), *vacated sub nom. Spector Motor Serv., Inc. v. McLaughlin*, 323 U.S. 101 (1944). Our caution in this respect flows from a recognition of our dependence on the adversarial process to test the issues for our decision and from concern for the affected parties to whom we traditionally extend notice and an opportunity to be heard on issues that affect them. Second, *Skidmore* deference traditionally has been justified, at least in part, on an assumption that the agency in question has "specialized experience and broader investigations and information available to" it than do judges. *Mead*, 533 U.S. at 234 (internal quotation marks omitted). EPA has claimed, however, no comparative experience or expertise over us in rendering a legal interpretation of a criminal statute that Congress has never charged the Agency to administer and which we have long experience applying. Third, the principal dissent offers no indication what impact *Skidmore* deference makes to its analysis. If it makes no difference, then deciding the question is just an exercise in *dicta*. But if it *does* make a difference, then presumably the dissent would agree with us that, at least if viewed *de novo*, EPA's final land status determination *is* contrary to law.

-32-

following the Supreme Court's decision in *Venetie*? EPA argues it does; HRI says it does not.

EPA reads § 1151(b)'s three operative words, "dependent Indian communities," to require a two-step, multi-factor balancing test. First, and following *Watchman*, EPA says we must identify an appropriate "community of reference" by weighing three factors in balance: (1) the geographic definition of the proposed community; (2) the status of the area in question as a community; and (3) the community in the context of the surrounding area. Within the second of those factors, and again following *Watchman*, EPA says we must inquire whether there is "cohesiveness that can be manifested either by economic pursuits in the area, common interests, or needs of the inhabitants as supplied by that locality," and consider "whether the community is more than an economic pursuit, and whether it qualifies as a mini-society consisting of personal residences and an infrastructure potentially including religious and cultural institutions, schools, emergency services, public utilities, groceries, shops, restaurants, and the other needs, necessities, and wants of modern life." *Land Status Determination* at 5 (internal alterations and quotation marks omitted). And within the third factor, EPA says, we must also ask "which government or governments provide the infrastructure and essential services for the community." *Id.* at 6. In EPA's view, none of the analysis to this point is affected by *Venetie*.

Having balanced all these competing considerations to identify some "community of reference," EPA moves to the second *Watchman* step, which it does view as modified by *Venetie*. Before *Venetie*, the *Watchman* test sought to determine whether a community of reference qualified as a dependent Indian community by considering four factors: (1) whether and to what degree the United States has retained title to the lands in the community, (2) the nature of the area and the relationship of the inhabitants in the area to Indian tribes and to the federal government, (3) whether there is "an element of cohesiveness . . . manifested either by economic pursuits in the area, common interests, or needs of the inhabitants as supplied by that locality"; and (4) "whether such lands have been set apart for the use, occupancy and protection of dependent Indian peoples." *Watchman*, 52 F.3d at 1545. EPA suggests that, after *Venetie*, the second and third of these factors are no longer operative, and that the first and fourth essentially track *Venetie*'s set-aside and federal superintendence requirements. Accordingly, EPA submits, if some sufficiently high (though unspecified) percentage of the community of reference is set aside for Indians and federally superintended, then all the land inside that community should be treated as Indian country regardless whether any particular tract is set aside and superintended. Weighing all the foregoing considerations, EPA argues that HRI's Section 8 land, though itself neither set aside nor superintended for Indians, is Indian country nonetheless because it lies within the Church Rock Chapter

community of reference and, by the Agency's calculation, enough of *that* land is set aside and superintended for Indians.

For its part, HRI submits that *Venetie* leaves no room for EPA's reading of § 1151(b). After *Venetie*, HRI urges, the appropriate § 1151(b) test asks only two straightforward questions: (1) Has Congress explicitly set aside the land in question for Indian use? (2) Does the federal government superintend the land in question? Unless the answer to both questions is "yes," the land in question is not within a dependent Indian community. HRI stresses that *Venetie* expressly rejected the Ninth Circuit's § 1151(b) test, a test that was consciously patterned on this court's pre-*Venetie* jurisprudence and employed the same factors found in the *Watchman* community of reference test. In addition, HRI submits that the fact-intensive and multi-factored community of reference balancing test leaves the scope of federal criminal jurisdiction impermissibly uncertain and unpredictable, contravening the Supreme Court's direction in *Venetie* and its repeated admonitions elsewhere that criminal statutes merit more concrete and precise constructions.

We are constrained to agree with HRI. We hold that *Watchman*'s community of reference test did not survive *Venetie* and that dependent Indian communities under § 1151(b) consist only of lands explicitly set aside for Indian use by Congress (or its designee) and federally superintended. We reach this result in light of *Venetie*'s exposition of the statute's plain meaning (Section

III.A), the statute's history (Section III.B), and the statute's structure (Section III.C), and in doing so we bring the law of this circuit in line with the recent decisions of our sister circuits (Section III.D).

A

In *Venetie*, the Supreme Court explained that "dependent Indian communities" under § 1151(b) embrace "a limited category of Indian lands that are neither reservations nor allotments" encompassed by § 1151(a) and (c), respectively. 522 U.S. at 527. The Court then identified two necessary "requirements" for lands falling into § 1151(b)'s "dependent Indian communities" category, explaining that, much like reservations or allotments, "first, they must have been set aside by the Federal Government for the use of the Indians as Indian land; second, they must be under federal superintendence." *Id.*

What does it mean for the federal government to set aside land for Indian use and to superintend it? The Court noted that the set-aside requirement means that there must be "some explicit action by Congress (or the Executive, acting under delegated authority) . . . to create or to recognize" the "land in question" as part of a federally recognized and dependent Indian community. 522 U.S. at 531 n.6. Through an Act of Congress or some equally explicit executive action, then, the federal government must identify the land as "*set apart for the use of the Indians as such.*" *Id.* at 529 (internal quotation marks omitted) (emphasis in original). So, for example, land simply conveyed by Congress to individual

-36-

Indians or tribes that they are then "free to use . . . for non-Indian purposes" or sell as they wish does not qualify. *Id.* at 533. While groups of Indians may very well live on such lands in socially and politically discrete communities, they do not live in "Indian country" because the land in question has not been explicitly set aside by Congress for use as a "dependent Indian community." The superintendence requirement means that the federal government currently must be "actively controll[ing] the lands in question, effectively acting as a guardian for the Indians." *Id.* This requirement, too, necessarily excludes lands that the government has conveyed without restriction to Indians or others because such lands do not implicate any sense of "guardian[ship]," "wardship[,] or trusteeship." *Id.* (internal quotation marks omitted).

The set-aside and superintendence requirements, the Court explained, derive from the statute's plain language — "dependent Indian communities." The set-aside requirement "ensures that the land in question is occupied by an 'Indian community.'" *Id.* at 531. That is, the boundaries of the Indian community are demarcated by and delimited to those lands that are explicitly set aside by legislation or executive action for Indian use. The federal superintendence requirement "guarantees that the Indian community is sufficiently 'dependent' on the Federal Government that the Federal Government and the Indians involved, rather than the States, are to exercise primary jurisdiction over the land in question." *Id.*

-37-

In our case, it is undisputed that HRI's Section 8 land hasn't been explicitly set aside by Congress (or the Executive) for Indian use since the brief period when it was appended to the Najavo Reservation nearly a century ago. *See supra* Section I.A. It is likewise undisputed that the land isn't under federal superintendence, and hasn't been since the government sold it in 1970. *See id.* McKinley County and the State of New Mexico provide all essential public services to HRI's Section 8 land, including roads, law enforcement, and emergency and school services. The Navajo Church Rock Chapter recognizes that private lands within its boundaries, like HRI's, are subject to state jurisdiction and control. And state authorities have long assessed tax on HRI's property. Under *Venetie*'s interpretation of § 1151(b), it would seem unavoidable that the land in question is not Indian country.

Of course, EPA seeks to avoid just this conclusion by expanding the focus from HRI's particular tract to a wider "community of reference." According to the Agency, only *after* ascertaining *some* appropriate community of reference, by balancing various social, political, and geographic factors, should one then turn to the questions prescribed by the Supreme Court in *Venetie*, asking whether some significant percentage of the community of reference is set aside for Indian use and federally superintended.

This misreads *Venetie*. The Supreme Court did not direct its set-aside and superintendence inquiries toward some abstract "community of reference."

-38-

Instead, the Court told us (repeatedly) to ask whether the "land in question" is explicitly set aside for Indian use and federally superintended. *See, e.g.*, *Venetie*, 522 U.S. at 530, 531, 533. Before us, the only land in question in EPA's challenged final land status determination is HRI's segment of Section 8. And so it is only *that* land that is subject to, and the focus of, *Venetie*'s set-aside and superintendence requirements.

Tellingly, EPA adopted just this approach to § 1151(b) before *HRI I*, when it considered the Navajo Nation's request for SDWA authority over private lands in the checkerboard area. *See supra* Section I.B. EPA rejected the Navajo Nation's request, explaining that "[b]efore it could determine if a parcel of land is part of a dependent Indian community (and therefore is Indian country), the Agency would need more information about that particular parcel of land." R. 13b at 238. EPA itself, then, once focused its § 1151(b) analysis on the "particular parcel of land" in question. And it seemingly came to eschew this approach in favor of the community of reference test *only* after the panel in *HRI I* suggested in *dicta* that it should.[11]

---

[11] It is notable, too, that post-*Venetie* another arm of the government has taken the position, in a criminal matter before this court, that the proper focus is on the particular piece of land in question, explaining that "[f]ederal jurisdiction is absent over crimes which occur on land which has transferred from Indian ownership to non-Indian ownership." Brief of the United States at 7, *United States v. Arrieta*, 436 F.3d 1246 (10th Cir. 2006) (Nos. 04-2350, 05-2010).

Of course, EPA now tells us that focusing narrowly on the status of the "land in question" fails to give full vent to the statutory term "communities." The Agency stresses that § 1151(b) speaks of "dependent Indian *communities*," not parcels of land. And the Agency submits that, while *Venetie* defined the statutory terms "dependent" and "Indian," it did not consider "community," the final statutory term. The dissents offer this same critique. *See*, *e.g.*, Principal Dissent at 18; Separate Dissent at 2.

This, too, is in error. The *Venetie* Court *did* address the term "community," and did so in light of the statutory terms modifying it. The Court expressly held that "dependent Indian communities" are composed of those lands Congress (or the Executive, by delegation) has explicitly set aside and superintended for Indian use. As the Court clearly explained, "[t]he federal set-aside requirement ensures that the land in question is occupied by an '*Indian community*.'" *Venetie*, 522 U.S. at 531 (emphasis added). And the federal superintendence requirement, the Court emphasized, "guarantees that the *Indian community* is," in turn, "sufficiently 'dependent' on the Federal Government that" it should be subject primarily to federal, not state, jurisdiction. *Id.* (emphasis added).

In adopting the approach it did, moreover, the Court rejected the idea that the boundaries of a federally dependent Indian community should be determined by a sort of judicially administered census study of the nature of "the Indian tribe inhabiting" the area. *Id.* at 530 n.5. The right question, the Court held, is instead

-40-

whether Congress has taken some action to designate and maintain the land in question for Indian use. It is Congress's action alone that demarcates the boundaries of a dependent Indian community. *Id.*; *see also United States v. McGowan*, 302 U.S. 535, 538 (1938) ("Congress alone has the right to determine the manner in which this country's guardianship over the Indians shall be carried out."); *cf. Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 586 (1977) ("In determining whether . . . Reservation boundaries were subsequently diminished[,] . . . [t]he underlying premise is that congressional intent will control.").

In this way, the Court explained, the federal set-aside and superintendence requirements respect and give meaning to an important feature of our constitutional order — namely, "the fact that because Congress has plenary power over Indian affairs, *see* U.S. Const. art. I, § 8, cl. 3, some explicit action by Congress (or the Executive, acting under delegated authority) must be taken to create or to recognize Indian country." *Venetie*, 522 U.S. at 531 n.6. While social or political communities of Indians can exist anywhere in our country, and surely do in a great many places outside Indian country, federally "dependent Indian communities" exist only where and when Congress has said so.

Simply put, *Venetie* held that Congress — not the courts, not the states, not the Indian tribes — gets to say what land is Indian country subject to federal jurisdiction. It is long settled that Congress does so by declaring land to be part of a reservation, or by authorizing its distribution as Indian allotments. And so it

is the case that Congress must take some equally "explicit action . . . to create or to recognize" dependent Indian communities. *Id.* When seeking to identify a § 1151(b) "dependent Indian community," we must ask whether Congress has explicitly set aside the "land in question" for Indian use and put it under federal superintendence. If Congress hasn't declared the land set aside for the establishment of a federally dependent Indian community, we are powerless to do so ourselves.[12]

Applying these principles in *Venetie*, the Supreme Court held that *none* of the 1.8 million acres of land granted by Congress in fee to the Neets'aii Gwich'in Indians in Alaska constituted a § 1151(b) "dependent Indian community." *Id.* at 523-24. It was undisputed that these lands were home to what EPA (and the dissents) would consider to be distinct Indian "communities of reference." After all, robust and well-defined Indian villages occupied the land. *See Venetie*, 101 F.3d at 1300. Despite such social, political, and geographic affinities, the

---

[12] The principal dissent errs when it suggests that under our reading of *Venetie* "title alone is determinative of whether a parcel of land is 'Indian country' under § 1151(b)." Principal Dissent at 11. The test we adopt at *Venetie*'s direction focuses on set-aside and superintendence, not title. While the results of the principal dissent's imagined title test would surely sometimes *coincide* with *Venetie*'s set-aside and superintendence test, the two are distinct. It is, after all, possible that Congress might set aside and guarantee federal superintendence for privately titled land, much as it holds certain privately titled lands within reservations to be Indian country. *See infra* Section III.B (discussing a 2005 law treating privately titled land within pueblos as Indian country). What the constitutional limits may be to Congress's authority to declare land titled to non-Indians to be part of Indian country is not before us. *See supra* note 5.

Supreme Court held that a § 1151(b) "dependent Indian community" didn't exist

on *any portion whatsoever* of the 1.8 million acres of tribal lands because *none* of

that land was congressionally set aside or superintended for Indian use.  And that

was because, when it passed the Alaska Native Claims Settlement Act

("ANCSA"), Congress deliberately revoked all existing Indian reservations in

Alaska "*set aside* by legislation or by Executive or Secretarial Order *for Native*

*use*" and granted tribal corporations fee title to those lands.  *Venetie*, 522 U.S. at

532 (quoting 43 U.S.C. § 1618(a)).  In taking this step, Congress contemplated

that the tribes could sell any or all of the lands to non-Indians, and could make

use of them as they wished for any purpose, Indian or non-Indian, without federal

approval.  "In no clearer fashion," the Supreme Court explained, "could Congress

have departed from its traditional practice of setting aside Indian lands."  *Id.*

Where there is no congressionally approved set-aside for Indian use, and no

federal superintendence, the Court underscored, there can be no dependent Indian

community for purposes of § 1151(b).[13]

---

[13]  The principal dissent emphasizes that *Venetie* considered the status of
the Tribe's 1.8 million acres of ANCSA land, though the dispute originally arose
when the Tribe claimed taxing authority over a small strip of land on which the
State of Alaska planned to build a school.  Apparently the principal dissent
believes this suggests that the Court *implicitly* thought of all 1.8 million acres of
ANCSA land as the appropriate "community of reference"; that is, the Court
*really* used a community of reference analysis, it just forgot or failed to say so.
*See* Principal Dissent at 18-19.  Nothing of the kind took place.  Before the Ninth
Circuit, the Tribe categorically claimed "inherent authority to tax activities

(continued...)

-43-

The *Watchman* community of reference test is inconsistent with this direction. Instead of asking whether Congress (or the Executive, through delegated authority) has taken some explicit action to set aside the land in question and whether the federal government superintends that land, it first conducts a threshold inquiry involving multiple competing factors that have no basis in *Venetie* or the text or history of § 1151(b).[14] Only after conducting this inquiry does the community of reference test turn to *Venetie*'s prescribed set-aside and superintendence questions. And even then the community of reference test asks only about the *degree* and *extent* to which some other, larger area is set

---

[13](...continued)
occurring" anywhere "within its [ANCSA] territory." *Venetie*, 101 F.3d at 1290. The Ninth Circuit agreed, holding that the Tribe enjoyed such taxing authority throughout the ANCSA territory. By dint of that holding, all 1.8 million acres were in dispute when the case came before the Supreme Court. The Court did not explicitly, implicitly, or otherwise hold that the whole 1.8 million acres, or any portion of it, qualified as an appropriate community of reference. Instead, the Court did what it instructed other courts facing § 1151(b) cases to do: it simply and straightforwardly analyzed whether the land in question in the litigation at hand — all 1.8 million acres of the Tribe's ANCSA land — was set aside or superintended. And it held that *none* of that land met those requirements.

[14] Indeed, for EPA's understanding of § 1151(b) to be correct, the statute would have to read very differently than it does, perhaps something like this: "All land must be part of some community of reference that is sufficiently cohesive economically and socially to be a mini-society. If the land in question is part of a community of reference that contains a sufficiently high percentage of Indian people and lands set aside for Indians and federally superintended, it is Indian country." What the statute actually says, of course, is that Indian country includes *dependent Indian communities* — that is, land that has been federally set aside for use by an "Indian community" that remains "dependent" on the federal government through its superintendence. *See Venetie*, 522 U.S. at 530-31.

aside and superintended. In this way, EPA's test effectively "reduc[es] the federal set-aside and superintendence requirements to mere considerations" — something *Venetie* expressly warned us against. 522 U.S. at 531 n.7.

In this same way, the community of reference test also disregards and regularly overrides Congress's plenary authority in charting the extent of Indian country. Applying the test here, EPA held HRI's land to be Indian country even though Congress has not explicitly set aside the land for Indian use and the most recent federal action with respect to this land was an executive order in 1911 *removing* it from Indian country. *See supra* Section I.A. It seems to us that, just as in *Venetie*, there could be "no clearer fashion" in which the federal government could have extinguished the Indian country status of HRI's land. *Venetie*, 522 U.S. at 532.

By disregarding Congress's authority, the community of reference test contemplates the possibility that even land never set aside by Congress for Indians can *become* Indian country simply because of its *proximity* to other lands that are federally set aside and superintended. This is so despite the fact that neither EPA nor the principal dissent has pointed us to a single case in the history of the Supreme Court or this court reaching such a result. Consider what happens when a tribe unilaterally redefines its borders to take in just a bit more land (like, say, the state park at the center of the Church Rock Chapter, or strips of private land currently outside but along the edges of the Chapter). *See* Appendix.

-45-

Assuming the social and political characteristics of this expanded community of reference remain more or less constant, land that once *wasn't* Indian country *becomes* Indian country by tribal preference or judicial decree rather than congressional action.

Neither does the community of reference test's disregard for Congress's authority work only to expand Indian communities. It can operate just as well the other way around — and would surely do so increasingly as time wears on and non-Indian communities encroach on Indian lands. What would happen, for example, if Gallup grows and dilutes adjacent Indian populations, so that the Chapter might no longer be said to constitute its own independent "mini-society," but only part of a greater Gallup "community of reference"? Presuming that this new greater Gallup community of reference wouldn't include a sufficient percentage of set-aside and superintended land, *no* land within its limits would constitute "Indian country" under § 1151(b). Under EPA's approach, land expressly set aside for Indian use and superintended by the federal government could and would lose its status as Indian country whenever social and political boundaries shift — and all this would happen even in the face of express and contrary congressional direction.[15] *Venetie* ties the jurisdictional determination to

_____

[15] This result, virtually inevitable under the community of reference test, sits uneasily with the Supreme Court's direction that the diminishment of reservations under § 1151(a), like additions to them, is Congress's prerogative

(continued...)

the proper hitch:  the will of Congress.  The same cannot be said of the

community of reference test.[16]

Any remaining question about the vitality of *Watchman*'s community of

reference test is answered by the fact that it would require us to revive the same

factors the Supreme Court rejected in *Venetie*.  Before the case reached the

Supreme Court, the Ninth Circuit looked to this circuit's then-governing

---

[15](...continued)
alone.  *See, e.g.*, *Solem v. Bartlett*, 465 U.S. 463, 470 (1984) ("The first and
governing principle is that only Congress can divest a reservation of its land and
diminish its boundaries."); *id.* at 471-72 (treating history of land after enactment
of a statute allegedly effecting reservation diminishment as "relevant" only to
"decipher Congress' intention," as an "additional clue as to what Congress
expected would happen"); *Rosebud Sioux Tribe*, 430 U.S. at 588 n.4 ("The focus
of our inquiry [in reservation diminishment cases] is congressional intent.");
*Yazzie*, 909 F.2d at 1393 ("Congress must clearly evince the intent to reduce
[reservation] boundaries.").

[16]  The dissents offer no response to this except to suggest that *Venetie*
permits us to ask about the "degree" or "extent" of federally set aside and
superintended land in the proximate area, relying on footnote 7 of the Court's
opinion.  Principal Dissent at 20 (quoting Cohen (2005) § 3.04[2][c][iii], at 194).
But rather than support the dissent's view, the cited footnote does just the
opposite.  The footnote was expressly aimed at *rejecting* the Ninth Circuit's use
of the factors that form the basis of the community of reference test, calling them
"extremely far removed" from the statute's language, history, and mandate.
*Venetie*, 522 U.S. at 531 n.7.  The Court indicated that the Ninth Circuit's
examination of the "degree" or "extent" of set-aside and superintended land in the
general area were "more relevant" inquiries, but the Court did not endorse this
aspect of the Ninth Circuit's approach either.  *Id.*  Instead, in formulating its own
test the Court repeatedly held that dependent Indian communities constitute only
those lands explicitly set aside by Congress for Indians and superintended by the
government for their benefit.  *See, e.g.*, *id.* at 527 (stating that the land "*must
have been set aside*" and "*must* be under federal superintendence" (emphasis
added)).

-47-

precedent for guidance in determining whether the land in question before it constituted Indian country under § 1151(b).  In fact, the Ninth Circuit applied a six-factor test that it called "virtually identical" to the second step of our *Watchman* analysis.  *Venetie*, 101 F.3d at 1294; *see id.* at 1291-92.  The Supreme Court, of course, proceeded to reject this "textured" balancing test.  *Venetie*, 522 U.S. at 531 n.7.  In particular, the Court criticized reliance on three factors — "the nature of the area," "the relationship of the area inhabitants to Indian tribes and the federal government," and "the degree of cohesiveness of the area inhabitants" — as "extremely far removed from" the more concrete set-aside and superintendence requirements.  *Id.*

As we have noted previously, many of the same factors appear in both steps of the *Watchman* analysis.  *See supra* Section I.C.  And the three specific factors the Supreme Court held impermissible in *Venetie* are among these reappearing factors.  Put more pointedly, the factors *Venetie* expressly rejected are found not just in *Watchman*'s second step; they also form the backbone of *Watchman*'s first step:  defining the community of reference.  For example, considering the "status of the area in question," as EPA did in its community of reference analysis, *Land Status Determination* at 5, is no different from looking at the "nature of the area," a consideration the Supreme Court rejected in *Venetie*.  522 U.S. at 531 n.7.  Searching for "the existence of an element of cohesiveness," as EPA did, *Land Status Determination* at 5, is indistinguishable from seeking to discern "the

-48-

degree of cohesiveness of the area inhabitants," which the Supreme Court held impermissible. *Venetie*, 522 U.S. at 531 n.7. And focusing "on which government or governments provide the infrastructure and essential services for the community," as EPA would have us do, *Land Status Determination* at 6, necessarily requires consideration of "the relationship of the area inhabitants to Indian tribes and the federal government," again something *Venetie* ruled out-of-bounds. 522 U.S. at 531 n.7. In EPA's application of *Watchman*'s community of reference test, then, the three factors *Venetie* discredited reemerge, like a phoenix, from their own demise. And in some ways, the community of reference test favored by EPA is even more problematic than the Ninth Circuit's approach. At least in the Ninth Circuit's test the three factors rejected by the Supreme Court were balanced in fair competition against the set-aside and superintendence requirements. In EPA's application of *Watchman*'s community of reference test, the rejected factors actually receive a promotion to an outcome-determinative *threshold* inquiry. The Agency offers us no credible explanation how we might lawfully revive, and then elevate, the very same factors the Supreme Court has expressly rejected.[17]

---

[17] Neither do the dissents. Instead, the principal dissent proposes a new community of reference test different from the one this court used in *Watchman* or EPA used in its final land status determination. The principal dissent would still apparently uphold EPA's determination, though, rather than remand the case for reconsideration under its newly formulated version of the community of

(continued...)

-49-

B

The *Venetie* Court didn't create its § 1151(b) test out of whole cloth, but consciously grounded its test in the language and history of the statute. On the latter score, the Court noted that subsection (b)'s use of the phrase "dependent Indian communities" was designed to codify language from the Supreme Court's decisions in *United States v. Sandoval*, 231 U.S. 28 (1913), and *United States v. McGowan*, 302 U.S. 535 (1938). *See Venetie*, 522 U.S. at 528-31; *see also* 18 U.S.C. § 1151 History; Ancillary Laws and Directive Notes ("Definition is based on latest construction of the term by the United States Supreme Court in *U.S. v. McGowan* following *U.S. v. Sandoval*." (citations omitted)). For that reason, *Venetie* examined and relied on these earlier decisions to give content and meaning to subsection (b), recognizing that when a legal concept like this "is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it." Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 537 (1947).

---

[17](...continued)
reference test. And it would do so even though its proposed test arguably might require additional fact finding by the Agency. Perhaps this is because, while the details are slightly changed, the essence of the test is not. Like the *Watchman* test EPA employed, the principal dissent's modified test would still have us look generally (and impermissibly) to the "coherence" of the area and its inhabitants and their social and political affinities. *See* Principal Dissent at 26-30.

An examination of these precedents, the soil in which § 1151(b) was germinated, confirms the implausibility of a community of reference test. *Sandoval* dealt with Congress's constitutional authority to include pueblos within "Indian country." The defendant in that case was prosecuted for bringing alcohol into the Santa Clara Pueblo. He was charged under a federal statute that "ma[de] it a punishable offense to introduce intoxicating liquor into the Indian country," and another statute specifically providing that all of the Santa Clara Pueblo constituted "Indian country." *Sandoval*, 231 U.S. at 36-37. Faced with these statutes, the Supreme Court was asked to decide whether Congress had the power to deem the pueblos part of Indian country. The Court answered in the affirmative, reasoning that the Indian Commerce Clause of the Constitution and "an unbroken current of judicial decisions have attributed to the United States . . . the power and the duty of exercising a fostering care and protection over all *dependent Indian communities* within its borders." *Id.* at 46 (emphasis added). While not a formal Indian reservation or allotment that might fall into today's § 1151(a) and (c) categories, the Court noted that *Congress* had "recognized the Pueblos' titles to their ancestral lands by statute," *executive orders* had "reserved additional lands 'for the [Pueblos'] use and occupancy,'" and "*Congress* had enacted legislation . . . 'in the exercise of the Government's guardianship over th[e] [Indian] tribes and their affairs' . . . including federal restrictions on the land's alienation." *Venetie*, 522 U.S. at 528 (quoting *Sandoval*, 231 U.S. at 39,

-51-

48) (emphasis added).  In this way, the Court held, Congress had taken deliberate and independent actions to set aside the land in question and guarantee its federal superintendence, thereby rendering it a federally dependent Indian community.

*McGowan* is to the same effect.  The case arose when the United States sought the forfeiture of two automobiles used to introduce alcohol into the Reno Indian Colony, which consisted of a single tract of land bought and owned by the federal government as a "permanent settlement" for "needy Indians scattered over the State of Nevada."  *McGowan*, 302 U.S. at 537.  The question presented to the Court was whether the Colony constituted "Indian country" under the same criminal statute at issue in *Sandoval*.  The Court concluded that the Colony, while neither a reservation nor an allotment, constituted a "dependent Indian communit[y]," *id.* at 538, because all of its land had been "validly set apart for the use of the Indians" and remained "under the superintendence of the government," *id.* at 539.  As *Venetie* explained, the *McGowan* Court stressed that "like Indian reservations generally, the colony had been 'validly set apart'" because the "Federal Government had created the colony by purchasing the land with 'funds appropriated by Congress,'" and it was federally superintended because "the Federal Government held the colony's land in trust for the benefit of

the Indians residing there."  *Venetie*, 522 U.S. at 529 (quoting *McGowan*, 302

U.S. at 537, 539).[18]

Nothing in *Sandoval* or *McGowan* suggests that the metes and bounds of

"dependent Indian communities" should be determined by a court's perceptions

about local social, political, or geographic affinities.  Rather, in both cases, the

Supreme Court identified "dependent Indian communities" based on

congressional intent, as expressed in independent statutory declarations.  Both

decisions emphasized that "the questions whether, to what extent, and for what

time [Indians] shall be recognized and dealt with as dependent tribes requiring the

guardianship and protection of the United States *are to be determined by*

*Congress, and not by the courts*."  *Sandoval*, 231 U.S. at 46 (emphasis added); *see*

*also McGowan*, 302 U.S. at 538 & n.9 (citing *Sandoval*, 231 U.S. at 46).  And

both explained Congress must express its intent to make land a "dependent Indian

community" by explicitly setting aside the land for Indian use and authorizing the

federal government to superintend the land for that purpose.  *Cf.* Felix S. Cohen's

_____

[18]  The fact that *Sandoval* and *McGowan* rested on an outdated sense of
cultural superiority, viewing the Indian communities at issue as dependent and in
need of paternalistic guidance by the federal government, may be further reason
to tread carefully before haphazardly expanding the subsection (b) class of
"dependent Indian community" lands without express congressional direction.
*See, e.g.*, James E. Lobsenz, *"Dependent Indian Communities": A Search for a
Twentieth Century Definition*, 24 Ariz. L. Rev. 1, 2 (1982) ("The
'quasi-sovereign' or 'dependent' status of the Indian tribe is inextricably linked to
past concepts of the Indian as an uncivilized savage who was to be gradually
elevated to the level of a civilized human being.").

Handbook of Federal Indian Law, Ch. 1, § 3 at 7 (Robert L. Bennett & Frederick M. Hart eds., 1971) (reprinting original 1942 edition) (hereinafter "Cohen (1942)") (summarizing *Sandoval* as explaining "that the term Indian country as applied to the Pueblos means any lands occupied by 'distinctly Indian communities' recognized and treated by the Government as 'dependent communities' entitled to its protection").

*Venetie*, thus, is nothing new under the sun. It simply reaffirms what the Supreme Court has always held to be the case: the dependent Indian community inquiry centers on whether Congress (or the Executive, by delegation) has taken some explicit action to set aside the land in question for Indian use and whether the land remains federally superintended. As always, we do well to follow the Supreme Court's guidance — most especially when that guidance has received the blessing of Congress through codification. Yet, EPA (like the dissents) makes no attempt to grapple with any of § 1151(b)'s considerable history and would instead have us view it in a vacuum, extirpated from the soil in which it grew.

Though not dispositive to our analysis, it also merits noting that the historic meaning of the statute recently received further congressional confirmation. Seeking to salve a dispute over the status of privately held lands within New Mexico pueblos, Congress passed the Indian Pueblo Land Act Amendments of 2005, Pub. L. No. 109-133, 119 Stat. 2573, *codified at* 25 U.S.C. § 331 Note. The law provides for federal and tribal criminal jurisdiction over offenses

committed involving Indians "anywhere within the exterior boundaries of any grant from a prior sovereign, as confirmed by Congress or the Court of Private Land Claims[, an Article I court established by Congress,] to a Pueblo Indian tribe of New Mexico." *Id.* If the community of reference test is correct, this law is surplusage, a waste of everyone's time and effort in writing, passing, and signing. Under the community of reference test, if and when a pueblo qualifies as an "appropriate community" (and surely that would be most of the time), everything in it, including privately held lands, is automatically subject to federal or tribal jurisdiction under § 1151(b). No additional law was or is or will ever be needed. The fact that Congress thought otherwise is one more (not inconsiderable) piece of evidence against the community of reference test — as is Congress's continued focus on boundaries "confirmed by Congress" or its designee, rather than on boundaries set by litigation over the latest social statistics.

C

The structure of § 1151 further confirms our understanding. The notion that some explicit, congressionally approved action is required to create "Indian country" is hardly foreign to the statute's design. Subsection (a) classifies reservations as Indian country, and reservations are traditionally created by and delineated according to boundaries Congress has set or sanctioned. Subsection (c) recognizes allotments as Indian country, and allotments, too, are a

-55-

product of congressional action, either directly or through delegation.  Subsection (b) serves as something of a catch-all provision, encompassing "a limited category of Indian lands that are neither reservations nor allotments" but that are still explicitly set aside for Indians by congressional mandate and superintended by the federal government.  *Venetie*, 522 U.S. at 527.  In all three of § 1151's subsections, then, the creation of Indian country hinges on some explicit action by Congress (or the Executive, acting under delegated authority).  Without some textual indication to think otherwise, it would be anomalous to think that subsection (b) alone was designed to permit the judiciary to commission or decommission Indian country by means of an atextual, multi-factor balancing test.

EPA attempts to overcome this by arguing that § 1151 as a whole is imbued with an "anti-checkerboard" purpose.  The Agency worries that looking to the congressionally approved status of each parcel of land will result in a patchwork, with some lands falling under federal jurisdiction while neighboring ones are subject to state jurisdiction.  In support of this argument, EPA cites *Seymour v. Superintendent of Washington State Penitentiary*, 368 U.S. 351, 358 (1962), and the 2005 edition of Cohen's Handbook of Federal Indian Law.  *See also* Principal Dissent at 10-11; Separate Dissent at 4.  But this argument overstates the statutory case against checkerboarding.  In *Seymour*, the Court simply observed the obvious:  subsection (a), by its express terms, includes within the definition of Indian country *all* lands within the congressionally prescribed boundaries of a

-56-

reservation, including private fee lands.  The 2005 edition of Cohen's Handbook adds nothing new to the mix, citing only *Seymour*.  Meanwhile, the 1982 edition of the Handbook on which the principal dissent relies expressly acknowledges that § 1151 "does not eliminate all forms of 'checkerboarding.'"  *See* Felix S. Cohen's Handbook of Federal Indian Law, Ch. 1, § D3c, at 39 & n.105 (Rennard Strickland et al. eds. 1982) (hereinafter "Cohen (1982)").

By indicating in subsection (a) that all lands within reservations are Indian country, Congress undoubtedly did something to mitigate the potential for checkerboard jurisdiction, as EPA observes.  But Congress did not pursue this goal single-mindedly throughout § 1151 at the expense of all other purposes. Indeed, as this court has previously explained, "Congress has authorized checkerboard jurisdiction under its definition of Indian country in 18 U.S.C. § 1151.  Although subsection 1151(a) clarifies that checkerboard titles within an existing reservation do not affect the status of an Indian reservation as reservation, subsections 1151(b) and (c) allow checkerboard jurisdiction outside reservation boundaries."  *Yazzie*, 909 F.2d at 1421-22 (emphasis omitted).  In this respect, then, § 1151 is just one more example of the fact that "[n]o legislation pursues its purposes at all costs" without consideration of competing goals and concerns.  *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 646 (1990) (quoting *Rodriguez v. United States*, 480 U.S. 522, 525-26 (1987) (per curiam)); *see also* John F. Manning, *Textualism and the Equity of the Statute*, 101 Colum.

L. Rev. 1, 18 (2001) ("Because statutory details may reflect only what competing groups could agree upon, legislation cannot be expected to pursue its purposes to their logical ends; accordingly, departing from a precise statutory text may do no more than disturb a carefully wrought legislative compromise.").[19]

In truth, Congress has authorized some degree of checkerboard jurisdiction in *all three* § 1151 categories of Indian country. As EPA stresses, subsection (a) evinces the strongest effort to minimize checkerboarding by declaring all lands within Indian reservations, including private fee lands, to be Indian country. But even this rule has its exceptions. So, for example, in the Indian liquor laws, Congress has *excluded* from Indian country any private "fee-patented lands in

---

[19] The dissents say we should "listen" to the Cohen Handbook's purported condemnation of checkerboarding. Separate Dissent at 4; *see also* Principal Dissent at 9-10, 20-21. Of course, we have and do listen to anyone who offers some valuable insight. But the various versions of the Handbook have hardly been as clear on this point as the dissents suggest. The 1982 edition acknowledged, as we did in *Yazzie*, that § 1151 "does not eliminate all forms of 'checkerboarding.'" Cohen (1982) Ch. 1, § D3c, at 39 n.105. The original edition of the Handbook — the only one authored by Professor Cohen's hand — was precise in reading *Sandoval* and *McGowan*, the progenitors of the term "dependent Indian communities," as including within Indian country only lands "which have been validly set apart for the use and occupancy of Indians." Cohen (1942) Ch. 1, § 3, at 8. And the language from the 2005 edition on which the dissents rely appears in a single sentence, citing and discussing only a § 1151(a) case. Surely, a stray sentence in one edition of a treatise — a sentence that cites no § 1151(b) case for support, that was authored many decades after the passage of the statute, and that is seemingly at odds with previous editions — cannot be the alpha and omega of this court's inquiry into statutory meaning.

non-Indian communities," even if they are located within reservations. 18 U.S.C. §§ 1154(c), 1156; *see also United States v. Mazurie*, 419 U.S. 544 (1975).[20]

Checkerboarding is also an unavoidable byproduct of subsection (c), as *Yazzie* and Cohen's Handbook note. *See Yazzie*, 909 F.2d at 1421-22; Cohen (1982) Ch. 1, § D3c, at 39 n.105 ("[A]n irregular arrangement of Indian country can exist through the inclusion of off-reservation allotments in its definition."). By definition, allotments outside reservations are stray plots, pieces of land, parcels. Set aside and superintended for Indians, they are Indian country even while neighboring territory is not. The "checkerboard region" of New Mexico

---

[20] The dissents read *Mazurie* to suggest that the Supreme Court has adopted an approach similar to the community of reference test for evaluating cases under 18 U.S.C. § 1154(c)'s "non-Indian communities" exception. *See* Principal Dissent at 13-14; Separate Dissent at 2-3. But *Mazurie* deals with an entirely different statutory provision *removing* from "Indian country" certain lands within the boundaries of a reservation — land that Congress has otherwise directed should be treated as "Indian country" under § 1151(a). Although the terms "non-Indian communities" and "dependent Indian communities" both concern communities, they deal with markedly different types of communities. And so the analysis to determine the bounds for each unsurprisingly differs. As *Venetie* explains, § 1151(b) requires a showing that *Congress has designated the land as an Indian community* (set-aside) and that *the community is federally dependent* (federal superintendence), while § 1154(c) non-Indian communities plainly require neither of these characteristics. Thus, although *Mazurie* tells us something about how to identify *non-Indian* communities under § 1154(c), it tells us nothing about how to identify *dependent Indian* communities under § 1151(b). The Supreme Court itself noted just this point. *See Mazurie*, 419 U.S. at 553 n.10 ("We note that the § 1154(c) exception is available for fee-patented lands which *are* in *non-Indian* communities, rather than for those which *are not* in *Indian* communities. This fact renders irrelevant the inability of prosecution witnesses to specify precise boundaries of the Fort Washakie Indian community.").

bears witness to all this, with Indian allotments lying cheek by jowl with lands owned by private persons or the state or the federal government. *See* Appendix. To be sure, Congress sought to mitigate, to a degree, the checkerboarding created by the allotment system by extending federal jurisdiction over "all Indian allotments, the Indian titles to which have not been extinguished, *including rights-of-way running through the same*." 18 U.S.C. § 1151(c) (emphasis added). But this hardly eliminates the checkerboard jurisdiction that allotments inevitably create. Indeed, nothing we might do today will ameliorate the checkerboard nature of the area in which HRI's land lies. The allotment system of subsection (c) bears the lion's share of blame for the area's jurisdictional patchwork, and no interpretation of subsection (b) will change that unavoidable fact.

While *no* interpretation of § 1151(b) can eliminate the area's checkerboarded character, *Venetie*'s set-aside and superintendence requirements at least ensure that the boundaries of dependent Indian communities will be precisely and predictably defined. Under the community of reference approach favored by EPA, these boundaries would be defined in a more convoluted and less predictable manner. And even after a "community of reference" is defined, its boundaries would likely be irregular, jigsawed, and themselves often hard to discern, as the boundaries of many communities are.

One glance at a map of the Church Rock Chapter confirms as much. *See* Appendix. The Chapter includes within its boundaries a narrow jog across

-60-

Interstate 40 and a small chunk of land south of the highway. And there it includes a long strip of private fee lands along the Chapter's southeastern boundary, yet (without explanation) not other immediately adjacent private fee lands. At the same time, in the center of the Chapter lies Red Rock State Park, which the Chapter excludes from its boundaries, creating a sort of doughnut hole (and raising the perplexing question: to what — noncontiguous — "community of reference" might the park belong?). If that weren't enough, and seemingly at odds with the exclusion of this particular piece of state-owned property, the Chapter purports (again without explanation) to include *other* state-owned lands within its boundaries. Far from curing a checkerboard problem, the upshot of the community of reference test is to invite an odd sort of parquetry all its own.[21]

Worse still, the community of reference test creates multiple, unpredictable, and shifting checkerboards — and does so in the context of a criminal statute, in tension with the "basic principle" of due process "that a criminal statute must give fair warning of the conduct that it makes a crime." *Bouie v. City of*

---

[21] EPA and the principal dissent fail to explain how the Red Rock doughnut hole might permissibly be excluded from their community of reference, while "a vacant lot in the middle of a developed neighborhood" *must* be part of the surrounding community. Principal Dissent at 9-10. It seems the only possible explanation they might offer is that the Navajo Nation has chosen to exclude the Red Rock State Park from the Church Rock Chapter boundaries. And this highlights one way the community of reference can go wrong, by impermissibly delegating to a tribe Congress's authority to define "Indian country." *See Venetie*, 522 U.S. at 531 n.6.

*Columbia*, 378 U.S. 347, 350 (1964); *cf. Flores-Figueroa v. United States*, 129 S. Ct. 1886, 1895 (2009) (Scalia, J., concurring in part and concurring in the judgment) (calling expansions of criminal liability based on factors outside the statute's text "not unlike the practice of Caligula, who reportedly wrote his laws in a very small character, and hung them up upon high pillars, the more effectually to ensnare the people" (internal quotation marks omitted)).

The Supreme Court has repeatedly warned us against the "judicial expansion of narrow and precise statutory language" in the criminal context because "a deprivation of the right of fair warning can result not only from vague statutory language but also from an unforeseeable and retroactive judicial expansion" of statutes. *Bouie*, 378 U.S. at 352.[22] This is a principle we cannot help but bear in mind even here, in a civil case. It remains, after all, a *criminal* statute we are expounding. And this is no mere "technical[ity]" or "hypothetical." Principal Dissent at 7; Separate Dissent at 4. Though EPA has chosen, for now at least, to link its SDWA permitting authority to the scope of a

---

[22] *See also Brendale v. Confederated Tribes & Bands of the Yakima Indian Nation*, 492 U.S. 408, 425 n.8 (1989) (White, J., for the Court in part and dissenting in part) (rejecting a proposed jurisdictional approach because the "uncertainty that would result from the necessarily case-by-case determination of which regulatory body (or bodies) has zoning jurisdiction over such land" (citations omitted)); *Ute Indian Tribe of the Uintah & Ouray Reservation v. State of Utah*, 114 F.3d 1513, 1527 (10th Cir. 1997) ("[T]he task of allocating jurisdiction necessarily involves line-drawing, and in an area where there is a compelling need for uniformity, there must be a single bright line.").

criminal statute, it may not have to live with this regulatory decision forever.  Our

interpretation of the statute, meanwhile, will apply to all criminal cases arising

under § 1151(b) and cannot so easily be discarded.[23]

*Venetie* supplies a test that is consistent with the statute's meaning, history,

and structure; and asking whether a piece of land has been explicitly set aside for

Indian use and is federally superintended is a reasonably precise and clear task.

The community of reference test, by contrast, is anything but these things.

Consider the couple who pops a bottle of champagne to celebrate their vacation

on private land in New Mexico that is neither set aside nor superintended for

Indians.  Say it turns out that the land beneath their picnic blanket is within the

political boundaries a Navajo Chapter has asserted for itself.  Has the couple just

committed a *federal* offense by introducing alcohol into a dependent Indian

community?  *See* 18 U.S.C. §§ 1154, 1156.  Under EPA's approach, no one could

be sure until a court has conducted a multi-factor community of reference test and

tallied up the set-aside and superintendence percentages.  Under that test, the

---

[23] The Supreme Court recently reminded us, moreover, that *even in civil cases* "administrative simplicity is a major virtue in a jurisdictional statute." *Hertz Corp. v. Friend*, 130 S. Ct. 1181, 1193 (2010); *see also id.* (explaining that "[s]imple jurisdictional rules . . . promote greater predictability[, which] is valuable to corporations making business and investment decisions").  This is because "[c]omplex jurisdictional tests complicate a case, eating up time and money as the parties litigate, not the merits of their claims, but which court is the right court to decide those claims." *Id.*  As a result, such tests "produce appeals and reversals, encourage gamesmanship, and, again, diminish the likelihood that results and settlements will reflect a claim's legal and factual merits." *Id.*

legality of one's actions would thus become a *post hoc* guessing game. Which nearby community might the court pick as its community of reference? Is the community's population cohesive enough? Are there enough businesses in town to make it a true "mini-society"? What percentage of the land within the community's boundaries is federally set aside and superintended? Is that percentage enough to make it a dependent Indian community? One wrong guess, and the pop of a champagne cork makes our couple federal offenders.

The case before us illustrates just how hard all that guessing can be. EPA determined that the appropriate community of reference in this case was the Church Rock Chapter, despite evidence that most of the Chapter's residents work in Gallup; most services and infrastructure are provided by the city, county, or state; the entire area around Section 8 is uninhabited and, in the Chapter's words, "not suitable for community . . . development"; and EPA itself has concluded that *no* community is ever likely to use the aquifer under HRI's land as a source of drinking water. On a record like this, it seems one might just as easily have determined that the "appropriate" community of reference was larger than the Chapter, perhaps embracing Gallup or all of McKinley County. Or, perhaps just as plausible, an area smaller than the Chapter, comprising only those outlying "rugged mountain ranges, canyons, and highlands" that the Chapter has indicated aren't suitable for development. *See HRI II*, 562 F.3d at 1269 (Frizzell, J., dissenting). Or perhaps one might have even concluded that HRI's land just isn't

part of any community at all.  The whole exercise takes on the feel of Goldilocks, searching for an "appropriate" community of reference that feels "just right."

And that's just the start of things.  Having defined a community of reference, it still remains under the approach urged by EPA and the dissents to ask whether a sufficient *degree* or *percentage* of the land in that community is set aside and federally superintended.  But the requisite degree or percentage, of course, is specified nowhere in the text of the statute, our pre-*Venetie* precedent, EPA's land status determination, or the dissenting opinions.  It must be, then, that this is a sort of I-know-it-when-I-see-it test.  *Cf. Jacobellis v. Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J. concurring).  EPA and the principal dissent tell us that 78% set-aside and 92% federal superintendence is sufficient.  *Land Status Determination* at 11-12; Principal Dissent at 32-33.  But one can't help to wonder:  Would 70% set-aside and 90% superintendence cut it?  And what happens when those percentages fall a bit farther still?  Or if the numbers are reversed?  Such extra-statutory guesswork is hardly the stuff on which criminal determinations should turn.[24]

---

[24]  EPA can't even be sure of the percentages on which it relies.  As the principal dissent acknowledges, the Agency's figures "do not add up exactly to 100%."  Principal Dissent at 2 n.1.  We are told not to worry, though, because the various percentages in the record are "within 2.4 %" of each other, *id.*, and this margin of error is — we are left to presume — no big deal.

Neither would the scope of "appropriate communities of reference" remain stable under EPA's approach. With such nebulous criteria to employ, different courts would surely reach different conclusions about whether the *same* parcel of land falls within one community of reference or another — and thus reach competing holdings about which sovereign enjoys primary criminal law authority. Worse still, and as we have already noted, even the *same* court may take a different view about a community of reference's boundaries at different times — shrinking or expanding those boundaries depending on social or political changes in the area. *See supra* Section III.A. So just because a piece of land was (or wasn't) Indian country at the time of the last judicial decision, that's no guarantee the result would be the same next time. No one could be sure.

The dissents' approach would complicate things further still by introducing the possibility of *special purpose* communities of reference. Given the "environmental context" in which this case arises, the principal dissent would have us consider presumed "common hydrolog[ical]" links between HRI's land and other parts of the Chapter. Principal Dissent at 14-15, 27. But one would think that, in non-environmental cases, courts would not be obliged to look at the hydrological "context" when trying to determine the appropriate community of reference. Who, after all, would fault the parties and court for failing to consider hydrological details in, say, a more conventional § 1151(b) case involving a conspiracy to commit various burglaries? Presumably, under the dissents'

approach, a court would instead focus on whatever the relevant "context" of the

case at hand may be. So, to take the burglary case, a court would presumably

take account of the "burglary context" in which the case arises. If strong links

are found to exist between the housing markets in Church Rock and Gallup, the

court might then conclude that the "appropriate" community of reference in that

"context" encompasses both. The appropriate community of reference in an

environmental case thus could be different than the appropriate community of

reference in a burglary case, and both might be different than the right community

of reference in still other kinds of cases. So it is that the same piece of land could

be *both* Indian country and *not* Indian country even in the same court at the same

time — depending, that is, on the "context" of the case.[25]

In this way, the community of reference test invites not just a

checkerboard, but a virtually three-dimensional checkerboard, a sort of ever-

---

[25] The dissents' approach rests on the factual premise that Section 8 shares a common "hydrology [with] the entire Church Rock Chapter," such that "any pollution into the aquifers" under Section 8 "would likely affect much of the Chapter population." Principal Dissent at 27-28. EPA, however, disputes this premise, having concluded that any aquifer affected by HRI's operations on Section 8 "cannot now and will not in the future serve as a source of drinking water." *See supra* Section I.C. And the dissents cite no record authority to support their competing claim. While this court is no less sensitive than the dissents to the potential contamination of drinking water, we can claim no expertise on the hydrology of McKinley County and have no idea whether EPA's scientific assessment (unchallenged by the parties before us), or the dissents', is correct. We can be certain, however, that the plain language of § 1151(b) doesn't require us to become hydrological experts to apply the law.

shifting jurisdictional Rubik's cube, "jettisoning relative predictability for the open-ended rough-and-tumble of factors" that assures "complex argument[s] in [the] trial court and . . . virtually inevitable appeal[s]." *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 547 (1995). And precisely because of the test's complexity, this dispute has dragged on, year after year, decade after decade, through regulatory proceedings, an appeal, a remand, and an appeal yet again. Since NMED granted HRI a UIC permit in 1989, the lawyers have fought, the parties have lobbied, and an agency and the courts have stewed over the mushy ingredients in the community of reference soup, all in an effort to get the recipe "just right." So it is that this dispute has nearly reached the age of majority waiting to be served the perfected answer.

Despite all this, the principal dissent levels the remarkable accusation that our decision today "introduc[es] confusion" into an area of law "settled for decades" and "overturn[s] decades of our precedent." Principal Dissent at 2; *see also id.* at 31. But not only is the atextual community of reference test the source of confusion in this area of law, it is hardly as old or as venerated as the dissents would have it. In fact, the community of reference test is *younger* than this dispute; it's been around for only fifteen of the sixty-two years since Congress

enacted § 1151(b).[26]  And in that time, the test has always been a work in progress, anything but "settled."

In the first place, the test has been applied only a few times since its genesis, and sporadically at that.  After *Watchman* created the test in 1995, we applied it in a published opinion *only once* before *Venetie* came along in 1998. *See Adair*, 111 F.3d at 774-75.[27]  When the Supreme Court speaks, it (of course) supercedes our prior case law.  And in 1999, in the first § 1151(b) case following *Venetie*, we did *not* use the community of reference test, but straightforwardly applied *Venetie*'s two requirements.  *See Roberts*, 185 F.3d at 1133.  In a second post-*Venetie* case that followed several years later, we appeared to split the difference, saying "[w]e examine the entire Indian community," but conducting no community of reference analysis and holding only that "lands within the exterior boundaries of a Pueblo land grant, *to which the Pueblo hold title*, are Indian country."  *United States v. Arrieta*, 436 F.3d 1246, 1250-51 (10th Cir.

---

[26]  The principal dissent pegs the test's age at twenty, citing the *Yazzie* decision from 1990.  But that's mistaken.  *Yazzie* adopted a holding under § 1151(a), not § 1151(b), and thus said nothing about a community of reference test.  The principal dissent's citation to *Yazzie* points to that decision's *appendix*, where this court merely reproduced (without endorsement) the district court opinion discussing § 1151(b) in a consolidated case.  That's why, five years later in *Watchman*, this court called the community of reference question "a question of first impression."  52 F.3d at 1543.

[27]  In an unpublished decision also preceding *Venetie*, a panel of this court acknowledged the existence of the community of reference test but declined to apply it because it "was not addressed by the parties or the district court."  *Eaves v. Champion*, 1997 WL 291186, at *2 n.4 (10th Cir. 1997) (unpublished).

2006) (emphasis added).  Thus, the *only* Tenth Circuit case clearly to employ the community of reference test after *Venetie* is *this* case, which created an intra-circuit split with *Roberts*, a fact that led us to grant *en banc* review.

In the second place, in each of the (few) cases we've applied the test, we've changed it.  Literally.  When creating the test in *Watchman*, we identified "two organizing principles" — "the status of the area in question as a community" and "the context of the surrounding area."  52 F.3d at 1543-44.  Two years later, in *Adair*, we added another factor concerned with "the geographical definition of the area proposed as a community."  111 F.3d at 774.  And in this case the principal dissent would have us reconfigure the factors in its balancing test yet again.  *See supra* note 17.  In its view, the test should now ask "whether the land . . . possesses a reasonable degree of coherence" and "whether the uses to which the land is put and the people inhabiting the land possess a reasonable degree of coherence."  Principal Dissent at 26.

Truth be told, then, the confusion in this area of law has been sown by the community of reference test.  Its lack of any basis in the statute's text, history, or structure, its multifarious and incommensurable competing factors, the unpredictable results it yields, and its constant judicial reworking — all of this has left the law and litigants confused.  Rather than adding to the confusion, our

decision today eschews yet more tinkering in favor of the simple and predictable

test the Supreme Court has told us to use.[28]

D

Though it does not control our outcome, it's worth noting that our decision

today brings the law of this circuit into harmony with the law developed in our

sister circuits after *Venetie*. In *Blunk v. Arizona Department of Transportation*,

177 F.3d 879 (9th Cir. 1999), the Ninth Circuit acknowledged that "*Venetie*

control[led] [its] decision," and then concluded that the Navajo fee land in

question before it was not Indian country under § 1151(b) because the land was

---

[28] The separate dissent's suggestion that our decision disregards the "effects of a mining operation that may greatly impact the surrounding lands," is likewise unwarranted. Separate Dissent at 5. No one questions that mining operations can pose "grave consequences." *Id.* It is this court's hope, no less than the hope of the dissents, that the appropriate agencies will do their assigned jobs in protecting the environment. *See, e.g.*, *Morris v. U.S. Nuclear Regulatory Comm'n*, 598 F.3d 677 (10th Cir. 2010) (upholding Nuclear Regulatory Commission licensing of HRI's uranium mining plans on Section 8). But we are judges, not environmental regulators. As such, "[o]ur charge," and all this court has sought or may properly seek to do, "is to give effect to the law Congress enacted." *Lewis v. City of Chicago*, 560 U.S. __, Slip Op. at 11 (2010).

The separate dissent is likewise mistaken when it suggests that today's decision means that HRI's activities will no longer be "subject to federal environmental regulations." Separate Dissent at 1, 6. As we have explained, the SDWA, a federal statute, provides the regulatory framework for *all* UIC permits nationwide. EPA regulations govern when those permits may be issued. Thus, although EPA may have delegated to NMED authority to issue permits in New Mexico, NMED may issue its permits *only* in compliance with federal law (SDWA) and federal (EPA) regulations. Indeed, EPA suggested that no case or controversy exists before us precisely because of this. *See supra* Section II.A.

neither set aside nor superintended by the federal government. *Id.* at 883-84. In reaching its conclusion, the Ninth Circuit rejected the notion, lying at the heart of EPA's position here, that the land in question might be considered Indian country "because of its proximity or importance to the Navajo Reservation." *Id.* at 884. The court conducted no community of reference analysis and considered no factors other than *Venetie*'s two requirements. *Id.* at 883-84.

In *Yankton Sioux Tribe v. Podhradsky*, 577 F.3d 951 (8th Cir. 2009), the Eighth Circuit conducted a similarly straightforward application of *Venetie*. Considering whether scattered trust lands qualified as Indian country under § 1151(b), the Eighth Circuit concluded that all of these lands "easily meet [*Venetie*'s] definition." *Id.* at 971. At no point did the court seek to place these various parcels within a larger community of reference, nor did it analyze the particular parcels at issue in light of any factors other than the two *Venetie* prescribes. *See id.* Had the Eighth Circuit applied the community of reference test urged by EPA, the result in *Yankton* might have been quite different — perhaps the non-Indian lands interspersed among the scattered trust lands might have become "Indian country," or perhaps, if the non-Indian land had predominated the community, the scattered trust lands might have ceased to be "Indian country" under § 1151(b).[29]

---

[29] For this reason, EPA and the principal dissent are wrong when they

(continued...)

A state court within our jurisdiction has also rejected this circuit's

community of reference jurisprudence in favor of *Venetie*'s two-part analysis.  In

*State v. Frank*, 52 P.3d 404 (N.M. 2002), the Supreme Court of New Mexico held

that the § 1151(b) inquiry must focus solely on the land in question, not on some

broader community of reference.  *Id.* at 409 ("In light of the clear guidelines in

the *Venetie* opinion, we decline to incorporate a community of reference inquiry

into our case law.").  Indeed, the court acknowledged, as we have today, that "the

six-factor test that was rejected by the Supreme Court in *Venetie* used essentially

the same factors as those in" this court's community of reference test.  *Id.*; *see*

*also id.* ("The *Venetie* two-prong test redirects our attention . . . away from the

more nebulous issue of community cohesiveness." (internal quotation marks

omitted)).[30]

---

[29](...continued)
suggest that *Blunk* and *Yankton* shouldn't be read to reject the use of a threshold
community of reference test because they didn't consider it.  *See* Principal
Dissent at 21-24.  The fact is that each court put *every* parcel of land at issue
through the *Venetie* two-part test and required that *each*, not some "percentage"
or "degree," satisfy those requirements.  In *Blunk*, none of the Navajo fee land
met *Venetie*'s requirements, while in *Yankton*, all of the miscellaneous trust lands
met the two requirements.  If the community of reference test were an essential
threshold inquiry, as EPA and the principal dissent argue, it's unclear how these
courts could have conducted a proper § 1151(b) analysis without it.

[30] The New Mexico Supreme Court took a somewhat different approach
when dealing with private land within pueblo boundaries.  *See State v. Romero*,
142 P.3d 887, 895 (N.M. 2006).  In *Romero*, the court held that private land
within the original land grant of the Taos pueblo is Indian country and therefore
beyond the state's criminal jurisdiction.  The *Romero* court distinguished its case
(continued...)

IV

Ultimately, *Venetie* compels us to abandon the community of reference test.

Under the proper test we adopt today, only two questions are relevant in assessing

claims of jurisdiction under § 1151(b):  (1) Has Congress (or the Executive,

acting pursuant to delegated authority) taken some action explicitly setting aside

the land in question for Indian use?  (2) Is the land in question superintended by

the federal government?  Because the parties agree that the land in question in

---

[30](...continued)
from *Frank* on the grounds that pueblos have long been recognized as Indian
country. *See id.* at 892.  Although the court appeared to treat the pueblo as a
dependent Indian community under § 1151(b), much of its analysis focused on
comparing pueblos to reservations under § 1151(a). *See, e.g.*, *id.* at 894 ("We
determine that a pueblo satisfying § 1151(b) is sufficiently similar to a
reservation in § 1151(a) to merit identical treatment for the purposes of criminal
jurisdiction.").  Along these lines, the court declined to conduct a community of
reference analysis, and instead analyzed the pueblo as it would a reservation.  It is
not entirely clear how to reconcile *Frank* and *Romero*, and to the extent that the
two cases conflict, we agree with *Frank*.  Land not explicitly set aside and
superintended is not Indian country under § 1151(b).  Neither is it clear whether
or what remaining force *Romero* bears today, given that Congress has now spoken
directly to the criminal jurisdictional status of privately titled lands within pueblo
boundaries in New Mexico. *See* Indian Pueblo Land Act Amendments of 2005,
Pub. L. No. 109-133, 119 Stat. 2573, *codified at* 25 U.S.C. § 331 Note; *see also*
*supra* Section III.B.  *Romero* was obliged to analyze the land in question under
§ 1151 alone rather than in light of Congress's new statute because the statute
didn't apply retroactively to the case. *See Romero*, 142 P.3d at n.1; *see also*
Robert L. Lucero, Jr., State v. Romero*: The Legacy of Pueblo Land Grants and
the Contours of Jurisdiction in Indian Country*, 37 N.M. L. Rev. 671, n.6 (2007)
(explaining the history and structure of the Act's jurisdictional grant).  And
considering that *Romero* explicitly declined to overrule *Frank*, there can little
question that *Frank* remains governing law in New Mexico. *See Romero*, 142
P.3d at 892.

EPA's final land status determination — HRI's segment of Section 8 — is neither explicitly set aside for Indian use nor federally superintended, it follows that, as a matter of law, the land does not qualify as Indian country under § 1151(b). And from this it follows that EPA's final land status determination holding otherwise must be vacated as inconsistent with the statute. While the outcome may have been different under this circuit's *Watchman* test, *Venetie* is now the law and neither we nor EPA may ignore it.

It may be that *Venetie* complicates to some degree EPA's efforts to regulate activities affecting underground water sources, which of course don't follow neat land survey lines. But that is because the Agency has chosen, in an exercise of its considerable discretion under the SDWA, to limit its primary regulatory authority over *water* quality to those Indian *lands* encompassed by § 1151, a criminal jurisdictional statute. While § 1151 does its job of assigning prosecutorial authority over particular tracts of land tolerably well, it is perhaps unsurprising that it may prove less satisfactory when it comes to allocating regulatory authority over aquifers running beneath those lands. Crimes, after all, usually occur on land, not in aquifers.

Someday, EPA may seek to avoid these difficulties by unhitching its UIC permitting authority from § 1151. We do not purport to pass on the propriety or wisdom of such a move. For now, we concern ourselves only with EPA's current choice to confine its authority in New Mexico to what § 1151 deems Indian

-75-

country. And on that score, we cannot help but conclude that EPA's final land status determination under review is inconsistent with the statute's terms as a matter of law and cannot stand.

The panel opinion is vacated, the petition for review is granted, and the EPA's final land determination is vacated.

# APPENDIX



Exhibit 18: Land Status

Churchrock Chapter Boundary
★ Chapter House

**Land Status**
- BLM
- INDIAN ALLOTMENT
- NAVAJO TRIBAL FEE
- NAVAJO TRIBAL TRUST
- PRIVATE
- STATE

EXHIBIT
1

**Churchrock Chapter
Land Status**

Churchrock Chapter Land Use Plan
Final - 11/02                                    B-39
Map labels added by SRIC, Jan. '06.

**EBEL**, Circuit Judge, joined by **BRISCOE**, Chief Judge, **HENRY**, **LUCERO**, and **MURPHY**, Circuit Judges, dissenting.

In Alaska v. Native Village of Venetie Tribal Government, 522 U.S. 520 (1998), the Supreme Court rejected the Ninth Circuit's multi-factor test for determining whether a given area of land constitutes a dependent Indian community. Instead, the Court held that a two-part test should be applied to determine whether the "land in question" is a dependent Indian community: first, by considering whether the land was "set aside by the Federal Government for the use of the Indians as Indian land," and second, assessing whether the land is "under federal superintendence." Id. at 527.

While this test is straight-forward enough, the Supreme Court did not address a separate, antecedent question: to what area of land should this two-part test be applied? In other words, how do we determine the "land in question"? Over the last twenty years in this circuit, we have held that a "community-of-reference" test must be employed to determine the appropriate community, before determining whether that community is both "dependent" and "Indian." See, e.g., Hydro Res., Inc. v. EPA ("HRI II"), 562 F.3d 1249, 1261 (10th Cir. 2009); Hydro Res., Inc. v. EPA ("HRI I"), 198 F.3d 1224, 1248 (10th Cir. 2000); United States v. Adair, 111 F.3d 770, 774 (10th Cir. 1997); Pittsburg & Midway Coal Mining Co. v. Watchman, 52 F.3d 1531, 1543 (10th Cir. 1995), abrogated in part by

Venetie, 522 U.S. 520; Pittsburg & Midway Coal Mining Co. v. Yazzie, 909 F.2d 1387, 1431 (10th Cir. 1990).

Today, the majority holds that, even though the Court in Venetie did not so much as consider the appropriate way to determine the relevant community—and, to the extent it did consider the question, it looked at the broader community rather than a narrow tract of land—Venetie nevertheless abrogated our community-of-reference test. By overturning decades of our precedent, the majority introduces confusion into an area of law that had been largely settled, and does so based on a case that did not even consider the issue. I respectfully dissent.

## I.    Background

The Church Rock Chapter of the Navajo Nation was formally certified as a local governmental unit by the Navajo Nation Council in 1955, although residents built a Chapter House for local governance purposes in 1946. The Chapter, which is located just east of the town of Gallup, New Mexico, consists of over 57,000 acres. The federal government holds approximately 52% of this land in trust for the Navajo nation, and holds an additional 26% in trust in the form of allotments to individual Indians. The Bureau of Land Management ("BLM") owns an additional 10% of the land, which is subject to grazing leases granted to Navajos.

In addition, the state of New Mexico owns about 4% the remaining land, and private interests own approximately 6%.[1]

In 1970, United Nuclear Corporation ("UNC") purchased 160 acres of land in the Church Rock Chapter, in the southeast corner of Section 8, Township 16N, Range 16W ("Section 8"), from the United States. HRI II, 562 F.3d at 1254. Hydro Resources, Inc. ("HRI"), a non-Indian mining corporation, later purchased the land, as well as UNC's patents for uranium-mining claims on that land, with the intent to operate a mine. Id. HRI thus owns this land in fee simple. The remaining three-fourths of Section 8 are owned by the United States in fee simple. Section 8 is surrounded on two sides by land owned by the United States in fee, and on two sides by land owned by the United States and held in trust for the Navajo.

No one lives on the Section 8 land, though the three-fourths of Section 8 not owned by HRI are subject to grazing permits issued by the United States Bureau of Indian Affairs ("BIA"). Located approximately six miles northeast of the Chapter House, the infrastructure on HRI's Section 8 land is primarily provided by the State of New Mexico and McKinley County. The state maintains the only access road to Section 8, State Highway 566, and HRI pays annual

---

[1] These figures do not add up exactly to 100%, and the record reflects some confusion as to the precise acreages of land owned by these different entities. Nonetheless, the various estimates provided in the record are all relatively close to one another, within 2.4%. I have cited the estimates used by EPA in its Determination, and neither party challenges the substantive accuracy of these numbers.

property taxes on the land to McKinley County. If HRI ever begins operating a mine on the property, the Public Service Company of New Mexico will provide it electricity, and the New Mexico State Water Engineer has already approved HRI's request for water rights.

In addition to the land in the Chapter being overwhelmingly owned by or for Navajos, the demography of the Chapter also shows an overwhelming Navajo presence. According to the 2000 census, approximately 98% of the Chapter's 2,802 residents are Navajo, and most of the rest are married to a Navajo. The residents primarily speak Navajo. Many residents of the Chapter raise livestock on Chapter lands—sometimes supplementing their income by producing traditional wares such as jewelry, stone and wood carvings, and by sewing and weaving—although some work in the nearby town of Gallup, which is located outside the boundaries of the Chapter.

The Chapter House, approximately three miles east of Gallup, acts as the social and political center for the Church Rock Chapter. Eighty-eight percent of Church Rock residents go to the Chapter House at least once a month. The Chapter House includes a Head Start center, elementary school, churches, and other buildings that provide for many of the residents' educational, spiritual, and health needs. The Navajo Nation "provides housing, electricity, drinking water, wastewater treatment, sewer services, and utilities," as well as police protection to residents of the Chapter, and the Chapter itself provides "scholarships, home

-4-

repair and purchase assistance, and meals for seniors." (R. doc. 44 at 21.)  The federal government also provides some services in the Chapter, including road maintenance, grazing management and permitting, social and health services, and conservation services.  While the state of New Mexico and the county maintain the main roads, most schools, and provide fire and EMS services, the Superintendent of the Eastern Navajo Agency of the BIA confirmed that the BIA considers the Church Rock Chapter to be a "distinct communit[y] of Navajo Indians who depend primarily on federal and tribal governmental services and protection."  (R. doc. 13b at 132.)

## II.    Discussion

As discussed more fully in the majority opinion, HRI now seeks a determination that EPA incorrectly decided that HRI's Section 8 land is part of a dependent Indian community and thus subject to EPA's jurisdiction for Safe Drinking Water Act ("SDWA") purposes rather than the jurisdiction of the New Mexico Environmental Department ("NMED").  HRI argues that EPA improperly considered the entire Church Rock Chapter in concluding that Section 8 was within a dependent Indian community, and that HRI's Section 8 land, by itself, does not constitute a dependent Indian community for purposes of § 1151(b). EPA and the Navajo Nation maintain that EPA correctly determined that HRI's Section 8 land is within a dependent Indian community and thus is Indian country

under § 1151(b).[2]

**A. The meaning of the word "communities" in 18 U.S.C. § 1151(b)**

The question presented by this appeal requires the court to determine the meaning of the phrase "dependent Indian communit[y]" as used in 18 U.S.C. § 1151(b). "As with any question of statutory interpretation, our analysis begins with the plain language of the statute." Jimenez v. Quarterman, --- U.S. ---, 129 S. Ct. 681, 685 (2009); see also Coffey v. Freeport McMoran Copper & Gold, 581 F.3d 1240, 1245 (10th Cir. 2009). Title 18, United States Code, Section 1151 provides:

the term "Indian country," as used in this chapter, means (a) all land

---

[2] I agree with the majority that EPA's Determination is not entitled to deference under Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council Inc., 467 U.S. 837 (1984). I would, however, afford the Determination deference under Skidmore v. Swift & Co., 323 U.S. 134 (1944). Skidmore deference is a lesser form of deference in which "the weight to be given the agency's practice in particular circumstances depends upon 'the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade.'" McGraw v. Barnhart, 450 F.3d 493, 501 (10th Cir. 2006) (quoting Skidmore, 323 U.S. at 140). Based on these factors, I would defer to EPA's Determination to a degree "proportional to its 'power to persuade.'" United States v. Mead Corp., 533 U.S. 218, 235 (2001) (quoting Skidmore, 323 U.S. at 140).

The majority states that it is "inappropriate" to consider whether the EPA's Determination warrants Skidmore deference because EPA has not asked for such deference. However, "[a] party's concession on the standard of review does not bind the court, as 'such a determination remains for the court to make for itself.'" United States v. Bain, 586 F.3d 634, 639 n.4 (8th Cir. 2009) (quoting K & T Enter., Inc. v. Zurich Ins. Co., 97 F.3d 171, 175 (6th Cir. 1996)); see also Worth v. Tyler, 276 F.3d 249, 262 n.4 (7th Cir. 2001); Izzarelli v. Rexene Prods. Co., 24 F.3d 1506, 1519 n.24 (5th Cir. 1994); cf. Gardner v. Galetka, 568 F.3d 862, 879 (10th Cir. 2009) (concluding that AEDPA's standard of review cannot be waived).

within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

18 U.S.C. § 1151 (emphasis added). While technically a criminal statute, § 1151 applies in civil contexts as well. See Venetie, 522 U.S. at 527 (citing DeCoteau v. Dist. County Court for Tenth Judicial Dist., 420 U.S. 425, 427 n.2 (1975)); see also Enlow v. Moore, 134 F.3d 993, 995 n.2 (10th Cir. 1998) ("18 U.S.C. § 1151 . . . defines 'Indian country' for civil as well as criminal jurisdiction.").

It is a well-settled principle of statutory construction that "we are to give meaning to every word of a statute where possible." Smith v. Midland Brake, Inc., 180 F.3d 1154, 1165 (10th Cir. 1999) (en banc) (citing Ratzlaf v. United States, 510 U.S. 135, 140 (1994)). Therefore, I begin from the uncontroversial premise that "dependent Indian communities" in subpart (b) must have some meaning that is independent from the meanings of "Indian country" provided in subparts (a) and (c) of the statute. Subpart (a) includes as "Indian country" "all land within the limits of any Indian reservation under the jurisdiction of the United States Government." 18 U.S.C. § 1151(a). Subpart (c) applies "Indian country" to "Indian allotments," which refers to "land owned by individual Indians and either held in trust by the United States or subject to a statutory restriction on alienation." Felix S. Cohen, Handbook of Federal Indian Law

§ 3.04[2][c][iv], at 195 (2005 ed.) (hereinafter "Cohen"); <u>see also</u> <u>United States v.</u> <u>Ramsey</u> 271 U.S. 467, 470 (1926).  Thus, a "dependent Indian community" must refer to something other than reservation lands and allotted lands.  <u>Venetie</u>, 522 U.S. at 527 (concluding that the phrase "dependent Indian communities . . . refers to a limited category of Indian lands that are neither reservations nor allotments"); <u>see also</u> <u>Okla. Tax Comm'n v. Sac & Fox Nation</u>, 508 U.S. 114, 123 (1993) ("Congress has defined Indian country broadly to include formal and informal reservations, dependent Indian communities, and Indian allotments . . . .").

The use of the word "community" in the statute implies the existence of some setting within which the property in question is to be evaluated.  Other areas of the law that draw upon the notion of a community show that community means context.  For example, the obscenity standard developed by the Supreme Court in the First Amendment arena requires the trier of fact to apply "contemporary community standards," a contextual inquiry that may produce different outcomes depending upon the community in which the test is applied.  <u>Miller v. California</u>, 413 U.S. 15, 32 (1973) ("It is neither realistic nor constitutionally sound to read the First Amendment as requiring that the people of Maine or Mississippi accept public depiction of conduct found tolerable in Las Vegas, or New York City.").  Similarly, when considering whether a governmental action violates the Establishment Clause of the First Amendment, courts consider whether a

-8-

reasonable observer, "aware of the history and context of the community and forum in which the religious display appears," would consider the action as endorsing religion. McCreary County, Ky. v. ACLU, 545 U.S. 844, 866 (2005) (quoting Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. 753, 780 (1995) (O'Connor, J., concurring in part and concurring in judgment)). Zoning regulations are also intended to "facilitate the orderly development of communities by confining particular uses to defined areas," so city planners must look at the context of the area in deciding what sorts of uses to allow in the community. 83 Am. Jur. 2d Zoning & Planning § 2 (2009). Throughout the law, then, the term "community" is used to place the object of judicial scrutiny in an appropriate context.

The structure of § 1151 further demonstrates that community requires a contextual analysis rather than the parcel-by-parcel analysis favored by HRI. Subsections (a) and (c) of § 1151 both refer to land: § 1151(a) references "all land within the limits of any Indian reservation," and § 1151(c) applies to "all Indian allotments," which are by definition specific tracts of land. See Cohen § 3.04[2][c][iv], at 195. Subsection (b), by contrast, does not refer directly to land, but instead uses the broader concept of "community." The ordinary use of the term "community" makes it clear that the term necessitates a broader approach. Someone looking at a vacant lot in the middle of a developed neighborhood would not say that the vacant lot is not part of the community that

surrounds the lot on all sides.  Similarly, a parcel of 160 acres completely surrounded by a community of 57,000 acres should not fail to be part of that community simply because of the ownership status of that parcel.

The purpose of § 1151 provides additional guidance for the proper interpretation of the term "community" in § 1151(b).  "[A] central purpose of the 1948 codification was to avoid checkerboard jurisdiction."  Cohen § 3.04[2][c][iii], at 194 n.429 (citing Seymour v. Superintendent of Wash. State Penitentiary, 368 U.S. 351, 358 (1962)).  Section 1151 was originally passed as a criminal statute, and, in passing the statute, Congress sought to foreclose a situation in which "law enforcement officers operating in [a checkerboard] area [would] find it necessary to search tract books in order to determine whether criminal jurisdiction over each particular offense . . . is in the State or Federal Government."  Seymour, 368 U.S. at 358.  While the Supreme Court in Seymour was referring to § 1151(a), which explicitly provides that Indian country applies to reservations "notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation," I think the Court meant what it said when it stated that "[s]uch an impractical pattern of checkerboard jurisdiction was avoided by the plain language of § 1151."  Id.

Felix Cohen agreed that it is "the full statute [that] was intended to reduce earlier difficulties which had arisen from the 'checkerboarding' of land ownership and rights-of-way.  Thus, patented parcels of land and rights-of-way within

dependent Indian communities should also be within Indian country." Felix S.

Cohen, Handbook of Federal Indian Law, Ch. 1 § D3c, at 39 (1982 ed.)

(hereinafter "Cohen (1982)") (emphasis added). Accordingly, the purpose of

Congress's codification of § 1151—to smooth out much of the checkerboard

jurisdiction that complicated enforcement of criminal law—shows that a

"community" approach, rather than an isolated parcel-by-parcel approach, should

be used to determine whether land is Indian country under § 1151(b).

The majority's conclusion that title alone is determinative of whether a

parcel of land is "Indian country" under § 1151(b) would completely eviscerate

this congressional purpose.[3] The problem of checkerboard jurisdiction is caused

by an interspersing of Indian-owned and non-Indian-owned lands in a relatively

small geographic area. Because the checkerboard problem is <u>caused</u> by title,

Congress would not have sought to remedy the problem by relying exclusively on

---

[3] The majority claims that its inquiry is solely into whether the specific parcel of land at issue is both set aside for Indian use and federally superintended, and thus does not focus on title at all. Maj. op. at 42 n.12. However, it is difficult to imagine a situation in which a piece of property owned in fee by a private individual, examined in isolation from the community in which the parcel of land is located, could meet these two criteria. In fact, HRI conceded at oral argument that, under its reading of § 1151(b), the inquiry is solely into who owns the land in fee. (Oral Argument Recording at 15:55 to 16:10.) In support of its dubious claim that title is not determinative under its § 1151(b) test, the majority cites to a note accompanying 25 U.S.C. § 331, which explicitly extends federal and tribal criminal jurisdiction to certain acts committed "anywhere within the external boundaries of a pueblo." But this citation to a note accompanying 25 U.S.C. § 331 is simply irrelevant to determining the proper construction of a phrase in 18 U.S.C. § 1151(b). However the majority chooses to frame it, a determination that land is privately held in fee will necessarily foreclose the possibility that the land is part of a dependent Indian community.

-11-

title to determine whether land is Indian country. Furthermore, if Congress had intended title to be determinative, it easily could have said so in § 1151. Instead, two of the three subsections of the statute (§ 1151(a) and (c)) clearly indicate that title is not determinative, and the third subsection (§ 1151(b)) uses a word, "communities," that, as discussed above, is inconsistent with a focus solely on title. In fact, the only time Congress alludes to title at all in the statute is to state that title is not determinative of land's Indian country status. See 18 U.S.C. § 1151(a) (defining Indian country to include "all land within the limits of any Indian reservation . . . notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation"); id. § 1151(c) (including rights-of-way running through Indian allotments as Indian country). While the Supreme Court has held that privately-owned land can constitute Indian country under § 1151, see Solem v. Bartlett, 465 U.S. 463, 468 (1984) (applying § 1151(a) to hold that "Indian country . . . include[s] lands held in fee by non-Indians"), today, this court becomes the first federal appellate court to hold that land is not Indian country solely because of who owns title. The language of the statute simply does not compel such a drastic result.

This interpretation of the word "communities" in § 1151(b) is consistent with the meaning the Supreme Court gave to that word in a related Indian statute. Section 1154, which prohibits the introduction of spirituous beverages into Indian country, starts with the same definition of "Indian country" found in 18 U.S.C. §

1151, but then specifically restricts that term, for the purposes of § 1154, by excluding "fee-patented lands in non-Indian communities or rights-of-way through Indian reservations" from Indian country status. 18 U.S.C. § 1154(c) (emphasis added).[4] The obvious inference to be drawn from this exclusion is that the status of a particular parcel of land as "fee-patented" is not determinative of its status as "Indian country" under § 1151, or else there would have been no need to specifically exclude such lands from the "Indian country" definition in § 1154.

In interpreting § 1154, the Supreme Court also confirmed this interpretation of the word "communities." In United States v. Mazurie, the defendants were charged under 18 U.S.C. § 1154 with introducing spirituous beverages into Indian country. 419 U.S. 544, 545 (1975).[5] The defendants in Mazurie operated a bar within the boundaries of the Wind River Reservation in central Wyoming, but "substantial tracts of non-Indian-held land are scattered within the reservation's boundaries," and the bar itself was located on privately-owned fee land within the reservation. Id. at 546-47. The Court agreed that the unincorporated town and surrounding areas were an "Indian community" within the meaning of 18 U.S.C. § 1154(c), based principally on the fact that over 80% of the families in the area were Indian, and 223 out of the 243 students enrolled in the nearby school were

---

[4] Section 1156, prohibiting the unlawful possession of intoxicating liquors in Indian country, also contains this definition of "Indian country." 18 U.S.C. § 1156.

[5] In Venetie, the Supreme Court did not criticize, or even refer to, Mazurie, and so the approach adopted by the Court in Mazurie remains valid.

Indian.  Id. at 550-52.  The Court thus gave meaning to the word "communities" in the statute by looking at the surrounding area of land in which the bar was located, rather than simply looking at the plot of land itself.  This further demonstrates that the word "communities," as used in the Indian statutes, requires an approach that places the specific parcel of land at issue in the context of the surrounding area.[6]

Finally, it should be remembered that this case arises specifically in an environmental context.  This case is before the court as a review of a determination made by the EPA pursuant to the SDWA that the portion of Section 8 at issue is a dependant Indian community and that "EPA is therefore the appropriate agency to consider underground injection control permit applications

---

[6] Sections 1151, 1154, and 1156 were all enacted together in 1948 as part of the Indian Major Crimes Act, and the "non-Indian communities" language was added to sections 1154 and 1156 the following year.  Indian Major Crimes Act, ch. 645, 62 Stat. 757-59 (1948); Act of May 24, 1949, ch. 139, 63 Stat. 94.  This statutory history supports interpreting these statutes together.  See Watchman, 52 F.3d at 1544 n.13 ("The courts have looked to non-Indian community cases and dependent Indian community cases when addressing either issue.").

As mentioned above, the majority cites to a statute enacted in 2005 that unambiguously provides for federal and tribal criminal jurisdiction in certain instances within the exterior boundaries of a pueblo as proof that § 1151(b) did not already extend jurisdiction to such lands.  Maj. op. at 54 (citing 25 U.S.C. § 331 Note).  To the extent a statute passed in 2005 has any significance to this court's interpretation of a statute passed in 1948, however, it shows only that Congress wanted to unambiguously extend federal and tribal jurisdiction within pueblos rather than rely on the contested interpretation of § 1151(b).  Accordingly, I consider the code provisions passed contemporaneously with § 1151 and that courts have consistently interpreted as interrelated with § 1151, see Watchman 52 F.3d at 1544 n.13, to be more instructive to the meaning of § 1151 than a bill passed five years ago and codified in a different title of the United States Code.

under the [SDWA] for that land." (R. doc. 44 at 1.) In the natural resources context, the notion of community assumes heightened importance. Aquifers generally are not found underneath just one specific isolated parcel of land, but rather extend under surrounding lands as well, and indeed the aquifer underneath HRI's Section 8 land runs underneath much of the Chapter. The externalities produced by a mining operation—including pollution, traffic, and the aesthetic harms created by having a large mining operation nearby—also affect the surrounding community. Indeed, the SDWA recognizes that water is a communal good that is affected by those around it and focuses much of its protection on "community water system[s]." 42 U.S.C. § 300f(15). Given the potential for diffuse harm posed by a mining operation, then, encouraging the checkerboard jurisdiction that Congress sought to avoid in enacting § 1151 makes even less sense in the SDWA context than it does in the criminal context in which the statute was originally enacted.

For these reasons, the word "communities" in § 1151(b) requires consideration of the land in context, and not in isolation on a parcel-by-parcel basis. See Cohen § 3.04[2][c][iii], at 194 (stating that a parcel-by-parcel approach "reads the word 'communities' out of the statute and increases the possibility of checkerboard jurisdiction").

**B. <u>Venetie</u>**

The majority concludes that the Supreme Court's decision in <u>Venetie</u> forecloses a community-of-reference analysis. I disagree.

A brief discussion of the factual background of <u>Venetie</u> elucidates what the Court did and did not decide in that case. In <u>Venetie</u>, the Native Village of Venetie Tribal Government sought to tax a private contractor and the State of Alaska, who were joint venturers in the construction of a public school on a specific parcel of land in the village of Venetie. 522 U.S. at 523. Venetie and another neighboring village had been part of a reservation established in 1943 for the Neets'aii Gwich'in Indians. <u>Id.</u> at 523. In 1971, however, Congress enacted the Alaska Native Claims Settlement Act (ANCSA), which "revoked the various reserves set aside . . . for Native use" and extinguished all native claims to Alaska land.[7] <u>Id.</u> at 524 (citing 43 U.S.C. §§ 1603, 1618(a)) (quotations omitted). As compensation, Congress authorized the transfer of $962.5 million and 44 million acres of Alaska land to state-chartered private business corporations. <u>Id.</u> Under the ANCSA, the shareholders of these corporations had to be Alaska Natives. <u>Id.</u> The land issued to these corporations was transferred in fee simple, with no restrictions on subsequent transfers of the land. <u>Id.</u> Two such corporations were formed for the Neets'aii Gwich'in, and the federal government, pursuant to the ANCSA, conveyed fee simple title to the land previously constituting the Venetie

---

[7] There was one exception to the revocation of the reserves, <u>see</u> 43 U.S.C. § 1618(a), but that exception was not relevant to the issue in <u>Venetie</u>.

Reservation to those corporations as tenants in common.  Id.

The Court of Appeals for the Ninth Circuit applied a six-factor balancing test to determine whether the former-reservation lands constituted a dependent Indian community, and thus was subject to taxation by the tribe for work performed in the community by non-Indian members.  State of Alaska ex rel. Yukon Flats Sch. Dist. v. Native Village of Venetie Tribal Gov't, 101 F.3d 1286, 1294 (9th Cir. 1996).  After applying this test, the Ninth Circuit concluded that the lands were both set aside and superintended by the federal government, and that the land was therefore Indian country under 18 U.S.C. § 1151(b).  Id. at 1302.

The Supreme Court reversed.  Rejecting the multi-factor balancing test employed by the Ninth Circuit to determine whether the land was set aside and superintended as a dependent Indian community, the Court held that § 1151(b) "refers to a limited category of Indian lands that are neither reservations nor allotments, and that satisfy two requirements—first, they must have been set aside by the Federal Government for the use of the Indians as Indian land; second, they must be under federal superintendence."  Venetie, 522 U.S. at 527.

Applying this test, the Court concluded that neither requirement was met. As to the set-aside requirement, the ANCSA explicitly "revoked all existing reservations in Alaska 'set aside by legislation or by Executive or Secretarial Order for Native use,'" and so the land was not currently set aside for Native use.

Id. at 532 (quoting 43 U.S.C. § 1618(a)).  The land also did not meet the federal superintendence requirement, as the ANCSA was intended to forestall a "lengthy wardship or trusteeship," 43 U.S.C. § 1601(b), and thus ended any superintendence of the lands.  Venetie, 522 U.S. at 533.  Accordingly, the Tribe's lands did not constitute a dependent Indian community, and hence did not constitute Indian country, within the meaning of 18 U.S.C. § 1151(b).

Section 1151(b) uses three criteria to define Indian country: (1) it must be dependent; (2) it must be Indian; and (3) it must be a community.  Venetie provides the criteria for determining whether an area of land satisfies (1) and (2): (1) the land is "dependent" if it is under federal superintendence, and (2) the land is "Indian" if it has "been set aside by the Federal Government for the use of the Indians as Indian land."  Venetie, 522 U.S. at 527.  Yet the Venetie Court did not address the third criteria: determining whether the land in question is a community.  The set-aside and superintendence requirements address only the dependent and Indian character of the "land in question."

The "community" requirement determines what area of land constitutes "the land in question."  That question was not addressed specifically in Venetie other than to accept, without discussion, that it was the entire land formerly constituting the Neets'aii Gwich'in reservation before it was extinguished.  In the present case, the majority views HRI's quarter of Section 8 as the "land in question."  One would therefore expect, if it were following the majority's

analysis, that the <u>Venetie</u> Court would have narrowly considered whether just the land on which the school was to be built was a dependent Indian community. But the Court decidedly did not do so. Instead, the Court in <u>Venetie</u> looked at <u>all of the land that previously composed the Venetie Reservation</u>—not just the site of the proposed school—to determine whether that land constituted a dependent Indian community. <u>Venetie</u>, 522 U.S. at 523 ("In this case, <u>we must decide whether approximately 1.8 million acres of land</u> in northern Alaska, owned in fee simple by the Native Village of Venetie Tribal Government pursuant to the [ANCSA], is 'Indian country.'") (emphasis added); <u>see also</u> <u>id.</u> at 532 ("The Tribe's ANCSA lands do not satisfy either of these requirements."). Therefore, based solely on the words "land in question," which are employed to refer to a broad area of land encompassing the narrow strip of land directly in dispute in <u>Venetie</u>, the majority overturns a long history of Tenth Circuit authority that requires a separate determination of the appropriate community.

I agree with the majority that <u>Venetie</u> abrogated the multi-factor test for determining whether a given community is a dependent Indian community. <u>See</u> <u>HRI II</u>, 562 F.3d at 1262 ("<u>Venetie</u> . . . altered the second step of the <u>Watchman</u> inquiry." (citing <u>HRI I</u>, 198 F.3d at 1248)). However, <u>Venetie</u> simply did not discuss the first step of the <u>Watchman</u> analysis, namely, how the appropriate community is to be defined. At best, <u>Venetie</u> endorsed the application of its two-part requirement of set-aside and superintendence to a broader community of

-19-

reference than just the isolated parcel where the dispute is situated. At worst, Venetie simply does not address the issue of whether a community of reference should first be determined. However, the one thing that cannot be concluded from Venetie is that it abrogated the Tenth Circuit's long-standing community-of-reference test to determine the relevant community to which the set-aside and superintendence factors are then applied in order to determine whether the community is a dependent Indian community.

## C. Other interpretations of Venetie

Today's decision brings this circuit into conflict with the leading treatise in the field. According to Professor Cohen's treatise, the interpretation of § 1151(b) that focuses solely on the narrow parcel under inquiry "reads the word 'communities' out of the statute and increases the possibility of checkerboard jurisdiction." Cohen 3.04[2][c][iii], at 194. Furthermore,

> [t]he Court's decision in Venetie explicitly approved factors that appear to allow consideration of an entire community, so that fee lands might be considered part of a dependent Indian community: "[T]he degree of federal ownership of and control over the area, and the extent to which the area was set aside for the use, occupancy, and protection of dependent Indian peoples."

Id. (quoting Venetie, 522 U.S. at 531 n.7) (emphasis added). Cohen thus adopts the more natural reading of "dependent Indian communities" and concludes, as would I, that "patented parcels of land and rights-of-way may also be within Indian country if they are within a dependent Indian community." Id. at 195.

The majority cites two cases from our sister circuits that it claims support

-20-

its position. Upon closer review, however, these opinions do not address the community-of-reference question with which we are presented here. First, in Blunk v. Arizona Department of Transportation, 177 F.3d 879 (9th Cir. 1999), the Navajo Nation purchased land (the "Navajo Fee Land"), ten miles from the Navajo reservation, from a private owner, and leased a portion of that land to a non-Indian who erected billboards on the land. Id. at 880. When the state required the lessee to obtain a permit for his billboards, the lessee filed suit in federal court seeking a declaratory judgment that state regulation of the billboards was preempted by federal law and Navajo sovereignty. Id. at 881. In considering whether the Navajo Fee Land was "Indian country" so that preemption may preclude the state's regulation of the land, the Ninth Circuit concluded that "Venetie controls our decision." Id. at 883. "The Navajo Fee Land is neither within the Navajo reservation nor is it an Indian allotment. The Navajo Fee Land is not a dependent Indian community because the land was purchased in fee by the Navajo Nation rather than set aside by the Federal Government." Id. at 883-84. Additionally, the federal government did not "exercise any . . . level of superintendence over the Navajo Fee Land." Id. at 884.

Blunk, however, did not consider the threshold question presented here: namely, whether § 1151(b) requires that the court determine the appropriate community of reference before applying the Venetie requirements. To the extent Blunk is relevant to this case, it supports our conclusion, for the Blunk court did

-21-

not consider whether the narrow billboard leasehold—what HRI would label the "land in question"—was a dependent Indian community by itself, but rather whether the entire Navajo Fee Land, of which Blunk had only leased a portion, constituted such a community. See Blunk, 177 F.3d at 883 ("The Navajo Fee Land is not a dependent Indian community . . . ."). The most that could be gleaned from Blunk is that the Ninth Circuit did not consider whether a threshold requirement to determine a "community of reference" survived Venetie. At worst (from HRI's perspective), Blunk is contrary to its position here in the present appeal.

In addition, the facts of our case bear little resemblance to those in Blunk. Whereas 78% of the Church Rock Chapter is owned by the federal government in trust for either the Navajo Nation or individual Navajos, the tribe purchased the land in Blunk and owned title to it. In fact, Blunk is consistent with Tenth Circuit precedent. In a pre-Venetie case, this court concluded, as the Ninth Circuit did in Blunk, that land purchased and owned by a tribe in fee simple outside the reservation and not otherwise a part of a dependent Indian community was not Indian country merely by virtue of its tribal ownership, because the land was neither set-aside nor superintended by the federal government. Buzzard v. Okla. Tax Comm'n, 992 F.2d 1073, 1076 (10th Cir. 1993). Blunk therefore should not inform this court's analysis of a community of land that is predominantly owned by the federal government rather than the tribe.

In the second case cited by the majority, the Eighth Circuit held that 174.57 acres of land acquired by the United States in trust on behalf of the tribe was a dependent Indian community because it met both the set-aside and superintendence requirements. Yankton Sioux Tribe v. Podhradsky, 577 F.3d at 970-71. It does not appear that the parties in that case contested that the entire acreage at issue constituted the appropriate community of reference, and so the case provides no guidance on whether such an inquiry is precluded by Venetie. This case is also inapt because, in this circuit, "'lands held in trust by the United States for the Tribes are Indian Country within the meaning of § 1151(a)'" as informal reservations, and thus need not be analyzed under § 1151(b) at all. HRI I, 198 F.3d at 1254 (quoting Cheyenne-Arapaho Tribes v. Okla., 618 F.2d 665, 668 (10th Cir. 1980)). The majority therefore has not cited to a single court of appeals case after Venetie that rejects a community-of-reference approach to determining the existence of a dependent Indian community.

The majority states that it is "unclear how these courts could have conducted a proper § 1151(b) analysis without" the community of reference test if that is an essential threshold test. Maj. op. at 73 n.29. But neither case presented a situation where such a threshold test was required, and thus the holdings of those cases necessarily say nothing about the propriety of such a test. I cannot agree with the inference drawn by the majority that, by omitting any mention of a

-23-

community-of-reference test, those courts must have precluded the application of such a test.

The majority also cites to a decision by the New Mexico Supreme Court which does directly address the community-of-reference test and concludes that the test does not apply. See State v. Frank, 52 P.3d 404, 409 (N.M. 2002) ("In light of the clear guidelines in the Venetie opinion, we decline to incorporate a community of reference inquiry into our case law."). However, that court may have misinterpreted our community-of-reference test as comprising some of the balancing factors disapproved by Venetie rather than simply as an effort to determine the appropriate community of reference in §1151(b) to which to apply the Venetie test. See id. at 409. Further, the court in Frank did not directly address the arguments advanced here, including the statutory interpretation and policy arguments, and that Venetie addressed a factual situation that did not involve consideration of the appropriate community of reference.

In addition, four years later, the New Mexico Supreme Court appeared to qualify Frank's holding by recognizing that "the fee land within a § 1151(b) dependent Indian community is Indian country just like the fee land within a § 1151(a) reservation." State v. Romero, 142 P.3d 887, 895 (N.M. 2006). Admittedly, the land at issue in Romero was within a pueblo. Nevertheless, the court endorsed a larger community approach to determining whether privately-owned fee land within the pueblo is a dependent Indian community, and it

-24-

rejected the argument "that we should look only to the parcels of private fee land, rather than the whole pueblo." Id. at 892. The court further noted that "[c]onsidering the pueblo as a whole is also consistent with congressional intent in enacting § 1151 because it discourages checkerboarding," id., which, of course, is one of the primary arguments for retaining the community-of-reference analysis in § 1151(b) as introduced in Watchman. Thus, the New Mexico Supreme Court treated all of the land within the pueblo, including privately-held land, as the "land in question" for purposes of applying the Venetie factors. Id. Accordingly, the New Mexico Supreme Court recognizes that land within a dependent Indian community can be Indian country under § 1151 even though the specific parcel of land at issue is privately-owned in fee by non-Indians.

This New Mexico case law is therefore not particularly illuminating, both because "we [are not] bound by a state court's interpretation of federal law," Wilder v. Turner, 490 F.3d 810, 814 (10th Cir. 2007), and because, in light of Romero, it is not clear that the holding of Frank is still valid even in New Mexico courts.

### D. Application to Section 8

#### 1. Community of reference

Therefore, I conclude that a court considering whether a piece of land constitutes a dependent Indian community under 18 U.S.C. § 1151(b) should engage in a two-step process. First, when the area proposed as a community is

-25-

disputed, the court must determine the appropriate community of reference. Second, the court must apply the two Venetie factors to that community to determine whether that community is dependent and Indian. The community will thus constitute a dependent Indian community only if it was set aside for the use of the Indians and is under the superintendence of the federal government. Venetie, 522 U.S. at 531-32.

Determining the appropriate community of reference requires three steps. First, the court (or agency) must determine whether the proposed community has reasonably ascertainable boundaries. See Adair, 111 F.3d 770, 774 (10th Cir. 1997); see also Cohen (1982), Ch. 1 § D3c, at 39 ("[T]he statute intended to include only Indian communities with reasonably defined boundaries . . . ."). Next, the court must determine whether the land within those boundaries possesses a reasonable degree of coherence such that the land is logically treated as a community. Finally, the court should look at whether the uses to which the land is put and the people inhabiting the land possess a reasonable degree of coherence. If the area of land has reasonably ascertainable boundaries and the land possesses a reasonable degree of cohesiveness, then it is an appropriate community for the purpose of determining whether it is a dependent Indian community under 18 U.S.C. § 1151.

As articulated above, community, as used in § 1151(b), implies context. While Venetie did not address how to determine the appropriate community of

reference, it did make clear that the status of the land within the alleged community plays an important role in determining whether the land is part of a dependent Indian community. See Venetie, 522 U.S. at 530 n.5. Therefore, I initially consider the extent to which the land itself shares common features.

First, the hydrology of the Section 8 land is directly tied into the hydrology of the entire Church Rock Chapter. Three separate aquifers—the Westwater Canyon Aquifer, the Cow Springs Aquifer, and the Dakota Sandstone Aquifer—all run directly underneath the Section 8 land and throughout the Chapter. As of 1998, fourteen wells from the Westwater Canyon Aquifer—from which the Chapter residents predominately draw their drinking water—were within twenty miles of Section 8. The water from those wells meets primary SDWA standards, and the Branch Manager of the Water Management Branch of the Navajo Nation Department of Water Resources characterized the Westwater Canyon water as "outstanding." (R. doc. 13b at 252.) This common hydrology throughout the Chapter makes it difficult for any activities that affect the groundwater carried out on Section 8 land to be limited to that parcel. (R. doc. 40 at B-3 ("Westwater Canyon . . . has some of the area's groundwater and most of its uranium deposits.").) Rather, any pollution into the aquifers would likely affect much of the Chapter population.

In addition, the land throughout the Church Rock Chapter is connected based on its history and usage. Cf. Venetie, 522 U.S. at 523-24 (discussing

-27-

history of the Neets'aii Gwich'in lands). The land in the Church Rock Chapter is predominately devoted to livestock grazing; in fact, the portion of HRI-owned land within Section 8 is surrounded on all four sides by grazing land used by members of the Chapter. Grazing exists on Section 8 land, pursuant to BIA-issued grazing permits, in a manner that is integrated with the surrounding areas of the Chapter. For instance, Grazing Permit Number 7 contiguously covers over half of Section 8, all of Section 9, and half of Section 16, as well as a portion of Section 17; Grazing Permit Number 8 also covers part of Section 8, and extends south into Section 17. This demonstrates that Section 8's land is in no way distinct from the lands surrounding it and it is fully integrated in the land's history of supporting a livestock-based economy. From the standpoint of the characteristics of the land, then, Section 8 is part of the community of land in the Church Rock Chapter.

Although Venetie emphasized the importance of considering the land, it did not foreclose consideration of other factors for purposes of determining the community of reference. Indeed, while the word "community" can refer to the area in which a well-defined group of people lives, the word also refers to the group of people themselves. See Webster's Third New International Dictionary 460 (1986) (defining community as "a body of individuals organized into a unit or manifesting [usually] with awareness some unifying trait"). Consideration of the people who live within the Church Rock Chapter further shows that the Chapter is

properly considered a single community. Based on the 2000 census, 97.7% of the 2,802 residents of the Chapter are Indian, and most of the remaining sixty-five residents are married to Navajos. A majority of the residents speak Navajo. In addition to a common heritage, residents of Church Rock remain closely tied to the Chapter. 88% of the residents of Church Rock go to the Chapter House at least monthly, further underscoring the sense of community throughout the Chapter. Finally, through the Chapter House, the residents receive a variety of services, including a Head Start program, community health care, housing assistance, work programs, utility line extensions, and a food distribution center.

Therefore, on the basis of these various indicators, I would conclude that the Church Rock Chapter, rather than Section 8 itself, is the appropriate community of reference. This analysis gives effect to the intent of Congress embodied in § 1151 to avoid checkerboard jurisdiction. See Seymour, 368 U.S. at 358 (stating that Congress intended to avoid "an impractical pattern of checkerboard jurisdiction . . . by the plain language of § 1151"). "[T]he full statute was intended to reduce earlier difficulties which had arisen from the 'checkerboarding' of land ownership and rights-of-way." Cohen (1982), Ch. 1 § D3c, at 39. Consideration of whether a community qua community, rather than an individual tract of land, is Indian country gives meaning to the word "communities" in the statute, and limits the undesirable outcome where jurisdiction changes every mile.

The unfortunate consequences of the majority's opinion are made especially clear by the facts of this case. HRI seeks to operate a mine on portions of Section 8 and the adjoining Section 17. As Section 17 is trust land, however, it is unquestionably Indian country under 18 U.S.C. § 1151(a) and subject to EPA's jurisdiction for SDWA purposes. Now, under the majority's opinion, passing the invisible boundary between Section 17 and 8 transfers jurisdiction from EPA to NMED, despite the continuous mining operation and the shared aquifer between the two parcels (as well as the rest of the Chapter). Section 1151 sought to avoid such a jurisdiction-by-tractbook approach in the realm of criminal jurisdiction, and the EPA reasonably adopted the same standard to apply for purposes of SDWA jurisdiction.

The majority's extended discussion of the difficulties that would arise in administering a community-of-reference test overlooks one simple fact: community-of-reference has been the law in this circuit for the last twenty years. Outside of some conclusory and unsupported assertions offered by the states in their amicus brief, the parties have not called to our attention any significant problems that this test has caused. To the contrary, it is the majority that is casting off into uncharted waters, and while the community-of-reference test has caused no significant difficulties of which I am aware, the real-world implications of the majority's new approach are, quite frankly, unknown. Indeed, the relatively few cases seen by this court over the last two decades concerning

confusion over the appropriate community of reference is strong circumstantial evidence that the test in fact works well.

### 2.    The Venetie factors

Having established Church Rock Chapter as the appropriate community of reference, I would then apply Venetie's set-aside and superintendence requirements to determine if the Chapter constitutes a dependent Indian community.  Upon examination, both requirements are easily met.

In order for a community to satisfy the set-aside requirement, "the Federal Government must take some action setting apart the land for the use of the Indians 'as such.'"  Venetie, 522 U.S. at 530 n.5.; id. at 531 n.6 ("The federal set-aside requirement also reflects the fact that . . . some explicit action by Congress (or the Executive . . . ) must be taken to create or to recognize Indian country.").  Here, the government purchased several parcels in the area from the Santa Fe Pacific Railroad Company in the late 1920s.  See HRI II, 562 F.3d at 1254 n.3.  The government placed much of that land in trust for the Navajos and allotted the rest to individual Navajos.  Id. at 1252.  The government has set aside 78% of the land in the Chapter for the use of Indians either as trust land either for the tribe or for individuals in the form of allotments, and BLM owns an additional 10% of the land, for which grazing permits are granted to Navajos.  Considering the Chapter as the community, then, the Chapter has been set aside by the federal government for the use of the Navajo.

The Chapter also satisfies the federal superintendence requirement. "Superintendency over the land requires the active involvement of the federal government." Buzzard, 992 F.2d at 1076; see also Venetie, 522 U.S. at 533 (noting that, in past cases that found federal superintendence, "the Federal Government actively controlled the lands in question, effectively acting as a guardian for the Indians"). In McGowan, for example, the Court found superintendence where the federal government "retains title to the lands which it permits the Indians to occupy" and where the federal government "has authority to enact regulations and protective laws respecting this territory." 302 U.S. at 539; see also United States v. Roberts, 185 F.3d 1125, 1132-33 (10th Cir. 1999); Buzzard, 992 F.2d at 1076.

In the form of tribal trust land, allotments, or land owned by BLM, the federal government retains title to 92% of the land in the Chapter, and as title owner certainly retains superintendence over the land. In addition, EPA found that DOI supervises natural resources in the Chapter, and BIA supervises land use, issues grazing permits, "protect[s] Navajo Nation trust lands, natural resources, and water rights, and administer[s] various trust benefits on behalf" of the Chapter. (R. doc. 44 at 12.) Thus, not only does the federal government possess "authority to enact regulations and protective laws" in the Chapter, it frequently acts on that authority. McGowan, 302 U.S. at 539. Indeed, as the Navajo Nation noted, "[t]here is no significant difference in the way the United

-32-

States interacts with the Church Rock Chapter [and] the way it interacts with Chapters located in the Navajo Reservation proper," and reservations are under federal superintendence. (R. doc. 13a at 13.) The Chapter therefore is under federal superintendence.

### III. Conclusion

In my view, the Church Rock Chapter is the appropriate community of reference. As the Chapter satisfies both of the criteria identified in <u>Venetie</u>, I would conclude that HRI's Section 8 land is within a dependent Indian community and affirm the panel's decision.

The lengthy opinions generated by this case and the division within this court as to the proper interpretation of 18 U.S.C. § 1151(b) attest to the confusion surrounding this area of the law. This confusion is unfortunate, and the consequences are likely to be enormous, reintroducing checkerboard jurisdiction into the southwest on a grand scale and disrupting a field of law that had been settled for decades. In overturning our community-of-reference test, the majority today reaches a result not compelled by either Supreme Court or Tenth Circuit precedent. Before all is said and done, this confusion and the serious consequences generated by today's opinion may ultimately require resolution by the Supreme Court.

<u>Hydro Resources, Inc. v. United States Environmental Protection Agency</u>,
No. 07-9506

**HENRY**, Circuit Judge, joined by **BRISCOE,** Chief Judge, **LUCERO**, Circuit Judge, dissenting.


In this case, we must determine who regulates ground water injections containing radioactive substances on a tract of land surrounded by an Indian community. The majority holds that because the individual tract at issue was neither (a) "'set aside' by Congress (or the Executive, acting under delegated authority 'for the use of the Indians as Indian land[;]'" nor (b) "'dependent' in the sense that it is 'under federal superintendence,'" it is not part of a dependent Indian community under 18 U.S.C. § 1151(b). Maj. op. at 4-5 (quoting *Alaska v. Native Vill. of Venetie Tribal Gov't*, 522 U.S. 520, 527, 531 (1998)). Judge Ebel's well-crafted and well-reasoned dissent, which I join, applies the well-established community-of-reference standard, concludes that the Church Rock Chapter is the appropriate community of reference, and holds that the land at issue is within that dependent Indian community. As a result, in the dissent's view, the land at issue is subject to federal environmental regulations.

I write separately to underscore the major concerns that I have with the majority opinion–which I fear undoes decades of settled Indian law based upon sound principles. First, in my view, it is the majority, not the dissent, that fails to tie "the jurisdictional determination to the proper hitch: the will of Congress." Maj. op. at 46-47. Second, the Supreme Court's decision in *United States v.*

*Mazurie*, 419 U.S. 544, 551 (1975), which remains good law after *Venetie*, supports the community-of-reference approach. Third, *Venetie* itself, the Supreme Court case on which the majority grounds its rejection of the community-of-reference inquiry, did not involve non-Indian fee land surrounded by an Indian community and thus does not resolve the question before us. Fourth, I am not convinced that principles regarding the construction of criminal statutes should be applied here. Finally, and perhaps most importantly, the majority's approach conflicts with one of the central purposes of the statute at issue–to avoid checkerboard jurisdiction.

In 18 U.S.C. § 1151(b), Congress used the word "communities." A community is "a social group of any size whose members reside in a specific locality, share government, and have a common cultural and historic heritage." *Webster's New Universal Unabridged Dictionary*, at 298 (1989); *see also* Dissent at 8 (observing that the term "community" "implies the existence of some setting within which the property in question is to be evaluated"). Accordingly, in conducting a community-of-reference analysis that extends beyond the status of a particular parcel of land, it is the dissent and the panel opinion that are more firmly rooted in the words used by Congress.

As Judge Ebel also observes, the community-of-reference standard is supported by the Supreme Court's decision in *Mazurie*, 419 U.S. at 551. There, in rejecting the contention that a non-Indian tract was part of "a non-Indian

*community*" under 18 U.S.C. § 1154(b) (emphasis added), the Court considered the area within the Wind River Reservation that *surrounded* that tract.[1]  *See id.* (discussing evidence regarding "the 20-square-mile area roughly centered on [the non-Indian tract]").  The majority seeks to distinguish *Mazurie* on the grounds that "[a]lthough the terms 'non-Indian communities' and 'dependent Indian communities' both concern 'communities,' they deal with markedly different types of communities."  Maj op. at 59 n.20.  I find that distinction unsatisfying.  Surely, when Congress uses the same term in two related statutes, and when the widely accepted use of that term suggests context, *see* Dissent at 8-9, we ought to apply the same definition unless there are particularly persuasive reasons not to do so.  Here, I see no such reasons.

In particular, *Venetie* does not require us to abandon our established community-of- reference test with regard to the Section 8 land here at issue.  *Venetie* did not involve land owned by a non-Indian mining corporation in fee simple located in the midst of trust land and allotments that constitute "Indian country" under the other subsections of § 1151.  Thus, the Supreme Court's

---

[1]  That statute prohibits the introduction of "any malt, spirituous, or vinous liquor, including beer, ale, and wine, or any ardent or intoxicating liquor of any kind whatsoever into the Indian country."  18 U.S.C. § 1154(b).  It further provides that "[t]he term 'Indian country' as used in this section does not include fee-patented lands in non-Indian communities or rights-of-way through Indian reservations, and this section does not apply to such lands or rights-of-way in the absence of a treaty or statute extending the Indian liquor laws thereto."  18 U.S.C. § 1154(c).

decision does not tell us which particular lands we must consider in determining whether the set-aside and superintendence requirements have been met.

Additionally, I am not persuaded by the majority's view that our interpretation of the statute "will apply to all criminal cases arising under § 1151(b)." Maj. op. at 63. The EPA adopted § 1151's definition of "Indian country" in the course of administering the Safe Drinking Water Act. Moreover, as Judge Ebel reasons, the concept of community should be afforded heightened importance in the natural resources context. *See* Dissent at 15. It is that context that we consider here. I would leave the implications of our holding for hypothetical criminal prosecutions, if any, for actual cases in which prosecutions are brought regarding conduct in dependent Indian communities.

Further, I must take exception to the majority's view that because some degree of checkerboard jurisdiction is inevitable in the application of § 1151, we may veer away from that fundamental concern in applying the concept of a dependent Indian community to the facts of this case. Leading Indian law scholars have told us that "a central purpose of the 1948 codification [of § 1151] was to avoid checkerboard jurisdiction." *See* Felix S. Cohen, *Handbook of Federal Indian Law* § 3.04[2][c][iv], at 194 n.429 (2005 ed.) (citing *Seymour v. Superintendent of Wash. State Penitentiary*, 368 U.S. 351, 358 (1962)). I think we ought to listen to them, particularly when a non-Indian land owner proposes a mining operation that affects the surrounding community. In that circumstance, it

-4-

makes good sense to treat Section 8 as part of that community and to require the mining operation to comply with federal law.

I take little comfort in the majority's observation that, in the EPA's judgment, the aquifer under HRI's land "'does not currently serve as a source of drinking water'" and "'cannot now and will not in the future serve as a source of drinking water.'"  Maj. op. at 17 (quoting 40 C.F.R. § 146.4(a) & (b)).  Even if that is true in this case, there are other effects of a mining operation that may greatly impact the surrounding lands.  *See* Dissent at 15 (noting that "[t]he externalities produced by a mining operation—including pollution, traffic, and the aesthetic harms created by having a large mining operation nearby—also affect the surrounding community").

Moreover, as one scholar has noted, previous mining operations in the area at issue have had grave consequences:  "[t]he tailings from uranium mines have contaminated air, groundwater, streams and soil on the Navajo reservation.  The wind blew dust from the tailings piles into Navajo homes and water sources.  Holding ponds on the reservation associated with the uranium mines were not well-maintained.  In 1979, a mud dam near Church Rock, New Mexico[,] failed, spilling over 1,100 tons of uranium tailings, and an estimated 100 million gallons of radioactive wastewater into the Rio Puerco River.  This is the largest nuclear spill in U.S. history, and it caused extensive damage to the Navajo people, their lands, water resources and the livestock that drank the contaminated water."  *See*

-5-

Rebecca Tsosie, "Climate Change, Sustainability, and Globalization: Charting the Future of Indigenous Environmental Self-Determination," 4 *Envtl. & Energy L. & Pol'y J.* 188, 220 (2009).

As I understand it, under the rule announced by the majority, a uranium mine located on non-Indian land but surrounded by land that constitutes a dependent Indian community would not be subject to federal regulation. I fail to see how such a rule comports with the applicable statute, the case law, or the federal government's "distinctive obligation of trust . . . in its dealings with these dependent and sometimes exploited people." *Morton v. Ruiz*, 415 U.S. 199, 236 (1974) (internal quotation marks omitted).

The proper standard for identifying a dependent Indian community under 18 U.S.C. § 1151(b) is a matter of utmost importance to Indian tribes, the states, and the federal government. I would affirm the EPA's determination and the panel's ruling, and I must dissent from the majority's contrary conclusion. Additionally, in light of the disagreement among my colleagues, the continuing uncertainty in other courts about the proper application of *Venetie* in checkerboard areas like those at issue here, and the serious consequences of abandoning our well-established community-of-reference approach, I agree with Judge Ebel that a resolution of this issue by the United States Supreme Court is warranted.